

1 | State of California Department of Corrections and Rehabilitation
2 | Richard J. Donovan Correctional Facility at Rock Mountain
3 | Mr. ERROL D. SMITH
CDCR Registry No. #K-62584
4 | Housing Loc: F3-13-141(L)
P.O. Box 799003
5 | San Diego, CA 92179-9003

6 | Petitioner In Propria Persona

7 |

8 |

**FILED**

**FEB 1 4 2008**

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

2254 ✓   1983
FILING FEE PAID
Yes ____ No ✓
IFP MOTION FILED
Yes ____ No ✓
COPIES SENT TO
Court ✓  ProSe ____

-FOR COURT USE ONLY-

9 | IN THE UNITED STATES DISTRICT COURT FOR SOUTHERN DISTRICT

10 | ERROL D. SMITH,                    ) Case '08 CV 0303 JAH LSP
                                      ) Number:
11 |              Petitioner,          )
                                      ) PETITION FOR WRIT OF HABEAS CORPUS
12 |          vs.                      ) BY PERSON IN STATE CUSTODY (PURSU-
                                      ) ANT TO TITLE 28 U.S.C SEC.  2254);
13 | ROBERT J. HERNANDEZ, Warden of)  INCLUDING  EXHIBITS  A  THROUGH E,
     the Richard J. Donovan Correc-)  ATTACHED; WITH REQUEST FOR JUDICI-
14 | tional Facility at Rock Mtn.,     ) AL NOTICE AND LIMITED  EVIDENTIARY
                                      ) HEARING BASED ON GOOD CAUSE AS  IS
15 |              Respondent. )        PRESENTED
                                      )
16 |                                   ) Ca.App.2d Crim.  No.  B114703
                                      ) Superior Court  No.  GA023494

17 |

18 |     TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE,  AND  TO
19 | THE ASSIGNED MAGISTRATE  JUDGE PRESIDING;  AND  TO  EDMUND GERALD
     BROWN, JR., ATTORNEY GENERAL AND COUNSEL FOR ·THE RESPONDENT:

20 |     Petitioner, ERROL D. SMITH, a state prisoner by and through

21 | the fill grant of propria persona (pursuant to self representation)

22 | hereby petitions this honorable Court for a writ of habeas corpus,

23 | and having  apportioned its inherent  state  requirements,  and by

24 | this verified petition, alleges as follows:

25 |     Petitioner is currently incarcerated pursuant to judgment  of

26 | the Superior Court of the State of California  for  the  County of

27 | Los Angeles, case No. GA023494, in which he was rendered guilty of

28 | second degree murder and use of  a firearm  in  violation  of Penal

1

Code sections 187(a) and 12202.5(a);

1. Judgment in this case resulted by and through a jury trial which resulted in the sentence of 15 years to life for the second degree murder and 4 years for the gun use enhancement, which was also a total term of nineteen (19) years to life;

2. Appeal from the judgment was taken before the California Cpourt of Appeal (2nd.App./Div.Two), in People v. Smith, Case No. B114703, which was decided and denied on July 23, 1998;

3. Petition for Review was sought before the California Supreme Court, which was dismissed without discussion on September 30, 1998;

4. The Antiterrorism and Effective Death Penalty "Statute of Limitation" is at issue here and is presented as argued separately though it was and is filed simultaneously with the filing of this instant petition which accounts for equitable tolling of the statute of limitation as no fault of petitioner;

5. Petitioner's confinement is illegal and in a contravention of rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution; and Article I, Section 15 of the California Constitution, in that petitioner was also denied a fair and impartial trial of the matters based on the succinct claims which are now raised before this instant Federal Court;

6. First, petitioner's defense counsel failed to secure a proper investigation and/or present meritorious challenges to the critical statements gleaned and gained by the police whom conducted the crime scene interviews with witnesses and other suspects, or to communicate with petitioner on matters which pertained to the defense, including the fact that defense counsel did not share

2.

1  case related discovery with petitioner;

2      7. Finally, though not limited, petitioner's confinement is

3  in violation of his right to due process of law under the Fifth

4  and Fourteenth Amendments and the California Constitution, Article

5  I, section 15, in that the cumulative prejudice from just all of

6  these errors in his direct appeal and in this instant petition, in

7  fact have thus deprived petitioner of his right to a fair and imp-

8  artial trial. As a result of the multiple and critical errors the

9  trial court had become judicially raucous and even callous to this

10  petitioner's theory of the defense. Absent all of these errors, a

11  reasonable person could have concluded a reasonable doubt as to

12  whether or not petitioner was guilty of any of the charged crimi-

13  nal offenses, and certainly would have had a fair trial in the al-

14  ternative;

15      8. Petitioner has no other plain, speedy or adequate remedy

16  of law in that the present petition is based, at least in part, on

17  evidence which may not have been included in the records on appeal

18  for which it otherwise may have been considered;

19      9. That petitioner does entertain each of the claims asserted

20  in this petition as an effort to be heard on the merits of them

21  individually and cumulatively and for each of the contentions to

22  have been each exhausted before the Supreme Court of California.

23      WHEREFORE, petitioner requests that this Federal Court may:

24      1. Consolidate this habeas corpus petition with the trial

25  court records in People v. Smith, No. GA023494. That consolidation

26  is also particularly important in this case in order for the Court

27  to address petitioner's claim of cumulative prejudice from all of

28  the trial errors on habeas review, including this instant petition;

3.

facts, arrest and appellate records, and a review which is also advantageous in cases which are otherwise too burdensome for closer scrutiny regardless of how warranted it may be;

3. This Court may issue an order to show cause as to why the sentence should not be set aside or, in the alternative, to be modified in accordance to both law and fairness;

4. Upon the final review that this Court shall issue and order to set aside petitioner's conviction and sentence and granting such further relief as is appropriate and applicable in the interest of justice;

5. Order that in light of petitioner's lengthy sentence of nineteen (19) years to life, that the interest of justice warrants the appointment of counsel. (See, Title 18 U.S.C. Section 3006A(A)(2)(B); see also Weygandt v. Look, 718 F.2d 952, at 954 (9th Cir. 1983).)

Executed this __12__ day of January, 2008, at San Diego, California.

Respectfully submitted,

DATED: January __12__, 2008

Mr. ERROL D. SMITH, Petitioner.

In Propria Persona

California Penal Code Section 1258

4.

## TABLE OF CONTENTS

**Page:**

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . 5

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . 5

I. Procedural Background: . . . . . . . . . . . . . . . . . . 5

II. THE EVIDENCE PRESENTED IN THIS CASE . . . . . . . . . . . 5

    A. The Defense Case: . . . . . . . . . . . . . . . . . . . 5

1. Introduction: . . . . . . . . . . . . . . . . . . . . . . 5

2. The Crime Scene At Altadena and Lincoln Intersection: . . . . . 6

    A. Surveillance Conducted By Officer Patrick Tapia: . . . . . 6

    B. Responding Sheriff's Deputy Gutierrez and Curry: . . . . . 7

    C. Witness/Victim Alisha Rosses: . . . . . . . . . . . . . 8

    D. Witness Prunella Daniels: . . . . . . . . . . . . . . . 9

    E. Witness Nona Hatamian: . . . . . . . . . . . . . . . . 10

    F. Detectives John Gentzvein and David Kushner: . . . . . . 12

    G. Arrest and Mirandized Interview of Petitioner: . . . . . 12

    H. Firearm Evidence is Undisputed: . . . . . . . . . . . . 14

    I. Undisputed Facts Leading Up to Conviction: . . . . . . . 14

ARGUMENT I . . . . . . . . . . . . . . . . . . . . . . . . . 16

PETITIONER ACTED OUT OF REASONABLE (THOUGH UNJUSTIFIED) FEAR . . . 16
AT THE TIME OF THE SHOOTING AND THE LAW SHOULD HAVE RECOGNI-
ZED THE JUSTIFICATION OF SELF-DEFENSE BASED UPON THE SITUAT-
ION AS IT APPEARED TO PETITIONER AT THE TIME OF THE INCIDENT

    A. The Waiver Chimera: . . . . . . . . . . . . . . . . . . 17

    B. Overview: . . . . . . . . . . . . . . . . . . . . . . . 18

    C. The Appellate Court's Incorrect Analysis of the Law: . . . 23

TABLE OF CONTENTS (Continued)

                                                                    Page:

ARGUMENT II . . . . . . . . . . . . . . . . . . . . . . . . . 27

A CONVICTION FOR SECOND DEGREE MURDER CANNOT STAND WHERE THE . . . 27
WEIGHT OF THE EVIDENCE SHOWS THAT PETITIONER ACTED OUT OF AN
HONEST BUT UNREASONABLE BELIEF THAT HE WAS IN IMMINENT DAN-
GER OF DEATH OR GREAT BODILY INJURY

    A.  Substantial Evidence to Support an Implied Finding of  . . 29
        Malice is Lacking:

    B.  Since There was Insufficient Evidence as to the  . . . . . 32
        Required Element of Malice, the Court of Appeal
        Erred When it Concluded There was Substantial
        Evidence to Support the Verdict:

    C.  The Court of Appeal Decision was Error:  . . . . . . . . 32

    D.  Consideration of Facts Which Are Irrelevant to  . . . . . 35
        Habeas Claim, Wrong or Unreliable Because of
        the Absence of Process Designed to Reliably
        Determine Such Facts:

ARGUMENT III . . . . . . . . . . . . . . . . . . . . . . . . 36

ATTORNEY RICKARD SANTWIER PROVIDED PETITIONER INEFFECTIVE  . . . . 36
ASSISTANCE OF COUNSEL WHEN HE FAILED TO PROPERLY PREPARE,
INVESTIGATE, CALL WITNESSES TO THE TRIAL OR TO FILE A
MOTION FOR A NEW TRIAL

ARGUMENT IV . . . . . . . . . . . . . . . . . . . . . . . . . 38

PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN
ATTORNEY SANTWIER FAILED TO SUPPRESS HIS STATEMENT TO THE
POLICE ON APPLICABLE GROUNDS WARRANTING SUPPRESSION

    A.  Legal Discussion and Analysis  . . . . . . . . . . . . . 39

1.  Miranda v. Arizona, 384 U.S. 436 (1966):  . . . . . . . . . 39

ARGUMENT V.  . . . . . . . . . . . . . . . . . . . . . . . . 40

COUNSEL PROVIDED INEFFECTIVE ASSISTANCE WHEN HE FAILED TO . . . . 40
PRESENT TESTIMONY ON SANITY ISSUE AT TRIAL

ARGUMENT VI. . . . . . . . . . . . . . . . . . . . . . . . . 42

PETITIONER SUFFERED GROSS INEFFECTIVE ASSISTANCE OF COUNSEL  . . . 42
WHEN TRIAL COUNSEL DENIED HIM HIS RIGHT TO TESTIFY ON HIS
OWN BEHALF

---

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY
CV - 69 (5/98)

## TABLE OF CONTENTS (Continued)

Page:

ARGUMENT VII. . . . . . . . . . . . . . . . . . . . . 44

THE TRIAL COURT ERRED WHEN IT REFUSED TO GIVE THE JURY CALJIC  . . 44
5.10, 5.16, AND 5.43 WHICH WAS IN LINE WITH THE DEFENSE THE-
ORY OF THE CASE

ARGUMENT VIII. . . . . . . . . . . . . . . . . . . . . 45

A "TOLEDO" DEPARTURE IS PRESENT IN THIS CASE AND THERE WAS NO  . . 45
JUST CAUSE TO BOUND THIS CASE OVER TO THE SUPERIOR COURT

1. Introduction: . . . . . . . . . . . . . . . . . . 45

    A. Under The Toledo Doctrine, The Prosecution Is Bound  . . 47
       By The Extrajudicial Statements Of The Defendant They
       Introduced Unless There Is Competent And Substantial
       Evidence Incompatible With The Theory Of Excuse Or
       Mitigation:

    B. When The Toledo Doctrine Is Applied To The Present  . . 48
       Case, The Evidence At The Preliminary Hearing Is In-
       sufficient To Hold Petitioner To Answer To The Charge
       of Murder:

ARGUMENT IX. . . . . . . . . . . . . . . . . . . . . 50

THE CUMULATIVE EFFECTS OF THE ERRORS REQUIRES REVERSAL OF THE  . . 50
JUDGMENT

CONCLUSION . . . . . . . . . . . . . . . . . . . . . 52

## TABLE OF AUTHORITIES

<u>Cases:</u>                                                                    <u>Page:</u>

<u>Bashor v. Risley</u>, . . . . . . . . . . . . . . . . . . . . . . . 23
        730 F.2d 1228 (9th Cir. 1984)

<u>Brooks v. Tennessee</u>, . . . . . . . . . . . . . . . . . . . . 42-43
        (1972) 406 U.S. 605

<u>Capps v. Sullivan</u>, . . . . . . . . . . . . . . . . . . . . . . 38
        921 F.2d 260 (10th Cir. 1990)

<u>Chapman v. California</u>, . . . . . . . . . . . . . . . . . . . . 51
        (1967) 386 U.S. 18

<u>Code v. Montgomery</u>, . . . . . . . . . . . . . . . . . . . . . 38
        799 F.2d 1481 (11th Cir. 1986)

<u>Colorado v. Connelly</u>, . . . . . . . . . . . . . . . . . . . . 40
        (1986) 479 U.S. 157

<u>Conde v. Henry</u>, . . . . . . . . . . . . . . . . . . . . . . . 23
        198 F.3d 734 (9th Cir. 2000)

<u>Commiskey v. Superior Court</u>, . . . . . . . . . . . . . . . . 48
        (1992) 3 Cal.4th 1018

<u>Derrick v. Peterson</u>, . . . . . . . . . . . . . . . . . . . . 40
        924 F.2d 813 (9th Cir. 1990)

<u>Edwards v. Arizona</u>, . . . . . . . . . . . . . . . . . . . . . 40
        (1981) 451 U.S. 477

<u>Ellis v. Mullin</u>, . . . . . . . . . . . . . . . . . . . . . . 36
        312 F.3d 1201 (10th Cir. 2002)

<u>Ferguson v. Georgia</u>, . . . . . . . . . . . . . . . . . . . . 43
        (1961) 365 U.S. 570

<u>Goodwin v. Balkcom</u>, . . . . . . . . . . . . . . . . . . . . . 41
        684 F.2d 794 (11th Cir. 1982)

<u>Harich v. Wainwright</u>, . . . . . . . . . . . . . . . . . . . . 41
        813 F.2d 1082 (11th Cir. 1987)

<u>Hill v. Lockhart</u>, . . . . . . . . . . . . . . . . . . . . . . 37
        877 F.2d 698 (8th Cir. 1989)

<u>Hill v. Lockhart</u>, . . . . . . . . . . . . . . . . . . . . . . 37
        894 F.2d 1009 (8th Cir. 1990)

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY
CV - 69 (5/98)

## TABLE OF AUTHORITIES(Continued)

<u>Cases:</u>                                                                    <u>Page:</u>

<u>Holliness v. Estelle,</u> . . . . . . . . . . . . . . . 37
    569 F.Supp. 146 (W.D. Tex. 1983)

<u>In re Christian S.,</u> . . . . . . . . . . . . . . 22, 25, 27-29
    (1994) 7 Cal.4th 768

<u>In re Marquez,</u> . . . . . . . . . . . . . . . . . . 37
    (1992) 1 Cal.4th 584

<u>Kemp v. Leggett,</u> . . . . . . . . . . . . . . . . . 37
    635 F.2d 453 (5th Cir. 1981)

<u>Kimmelman v. Morrison,</u> . . . . . . . . . . . . . . . 40
    (1986) 477 U.S. 365

<u>Lema v. United States,</u> . . . . . . . . . . . . . . . 43
    987 F.2d 48 (1st Cir. 1993)

<u>Lincoln v. Sunn,</u> . . . . . . . . . . . . . . . . . 50
    8907 F.2d 805 (9th Cir. 1987)

<u>Mac v. Blodgett,</u> . . . . . . . . . . . . . . . . . 50
    970 F.2d 614 (9th Cir. 1992)

<u>Miller v. Wainwright,</u> . . . . . . . . . . . . . . . 41
    798 F.2d 426 (11th Cir. 1986)

<u>Mirand v. Arizona,</u> . . . . . . . . . . . . . . . . 39
    (1966) 384 U.S. 436

<u>People v. Acosta,</u> . . . . . . . . . . . . . . . . . 47
    (1995) 45 Cal.Rptr. 538

<u>People v. Alvarez,</u> . . . . . . . . . . . . . . . . 18
    (1996) 14 Cal.4th 155

<u>People v. Anders,</u> . . . . . . . . . . . . . . . . . 34
    (1990) 52 Cal.3d 453

<u>People v. Ceja,</u> . . . . . . . . . . . . . . . . 27, 29
    (1994) 26 Cal.App.4th 78

<u>People v. Childs,</u> . . . . . . . . . . . . . . . . . 48
    (1991) 226 Cal.App.3d 1397

<u>People v. Conley,</u> . . . . . . . . . . . . . . . . . 28
    (1966) 64 Cal.2d 310

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY
CV - 69 (5/98)

# TABLE OF AUTHORITIES(Continued)

**Cases:**                                                                 **Page:**

People v. Cruz, . . . . . . . . . . . . . . . . . . . . . 42
    (1980) 26 Cal.3d 233

People v. Fierro, . . . . . . . . . . . . . . . . . . . 33
    (1991) 1 Cal.4th 173

People v. Garceau, . . . . . . . . . . . . . . . . . . 33
    (1993) 6 Cal.4th 140

People v. Hawthorn, . . . . . . . . . . . . . . . . . 34
    (1992) 4 Cal.4th 24

People v. Hill, . . . . . . . . . . . . . . . . . . . 50
    (1998) 17 Cal.4th 800

People v. Hines, . . . . . . . . . . . . . . . . . . 17-18
    (1997) 15 Cal.4th 997

People v. Holt, . . . . . . . . . . . . . . . . . . . 18
    (1997) 15 Cal.4th 619

People v. Ledezma, . . . . . . . . . . . . . . . . . 37
    (1987) 43 Cal.3d 171

People v. Matthews, . . . . . . . . . . . . . . . . . 49
    (1988) 201 Cal.App.3d 385

People v. Orin, . . . . . . . . . . . . . . . . . . . 47
    (1975) 13 Cal.3d 937

People v. Osband, . . . . . . . . . . . . . . . . . . 32
    (1996) 13 Cal.4th 622

People v. Poddar, . . . . . . . . . . . . . . . . . . 28, 48
    (1974) 10 Cal.3d 750

People v. Pope, . . . . . . . . . . . . . . . . . . . 42
    (1979) 23 Cal.3d 412

People v. Roland, . . . . . . . . . . . . . . . . . . 33
    (1992) 4 Cal.4th 238

People v. Rosenkrantz, . . . . . . . . . . . . . . . . 28
    (1988) 198 Cal.App.3d 1187

People v. Ross, . . . . . . . . . . . . . . . . . . . 47
    (1979) 92 Cal.App.3d 391

## TABLE OF AUTHORITIES(Continued)

**Cases:**                                                                    **Page:**

People v. Sedeno, . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    (1974) 10 Cal.3d 703

People v. Slaughter, . . . . . . . . . . . . . . . . . . . . . 47, 49
    (1984) 35 Cal.3d 629

People v. Smith, . . . . . . . . . . . . . . . . . . . . . . . 2-3
    (1998) B114703 (2nd App.Div.Two)

People v. Thomas, . . . . . . . . . . . . . . . . . . . . . . 34
    (1992) 2 Cal.4th 489

People v. Toledo, . . . . . . . . . . . . . . . . . . . . . 45-50
    (1948) 85 Cal.App.2d 577

People v. Uhlemann, . . . . . . . . . . . . . . . . . . . . 48
    (1973) 9 Cal.3d 662

People v. Virginia, . . . . . . . . . . . . . . . . . . . . 32
    (1979) 443 U.S. 307

People v. Whitefield, . . . . . . . . . . . . . . . . . . 28, 42
    (1994) 7 Cal.4th 437

People v. Wolff, . . . . . . . . . . . . . . . . . . . . . 28
    (1964) 61 Cal.2d 795

Rose v. Moffitt, . . . . . . . . . . . . . . . . . . . . . 23
    (1974) 417 U.S. 600

Rock v. Arkansas, . . . . . . . . . . . . . . . . . . . . 42
    (1987) 483 U.S. 44

Thomas v. Hubbard, . . . . . . . . . . . . . . . . . . . . 50
    273 F.3d 1164 (9th Cir. 2001)

U.S. v. Bradshaw, . . . . . . . . . . . . . . . . . . . . 40
    935 F.2d 295 (D.C. Cir. 1991)

U.S. v. Burrows, . . . . . . . . . . . . . . . . . . . . . 41
    872 F.2d 915 (9th Cir. 1989)

U.S. v. Cronic, . . . . . . . . . . . . . . . . . . . . . 42
    (1984) 466 U.S. 648

U.S. v. Escobar de Bright, . . . . . . . . . . . . . . . . 17
    742 F.2d 1196 (9th Cir. 1984)

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY
CV - 69 (5/98)

## TABLE OF AUTHORITIES(Continued)

**Cases:**                                                                              **Page:**

U.S. v. Mason, . . . . . . . . . . . . . . . . . . . . . 23
    902 F.2d 1434 (9th Cir. 1990)

U.S. v. McLister, . . . . . . . . . . . . . . . . . . . 50
    608 F.2d 785 (9th Cir. 1979)

U.S. v. Moody, . . . . . . . . . . . . . . . . . . . . . 42
    977 F.2d 1425 (11th Cir. 1992)

U.S. v. Teague, . . . . . . . . . . . . . . . . . . . . 43
    953 F.2d 1525 (11th Cir. 1992)

U.S. v. Tucker, . . . . . . . . . . . . . . . . . . . . 38
    716 F.2d 576 (9th Cir. 1983)

U.S. v. Unruh, . . . . . . . . . . . . . . . . . . . . . 17
    855 F.2d 1363 (9th Cir. 1988)

U.S. v. Zuniga, . . . . . . . . . . . . . . . . . . . . 17
    6 F.3d 569 (9th Cir. 1993)

Weygandt v. Look, . . . . . . . . . . . . . . . . . . . 4
    718 F.2d 952 (9th Cir. 1983)

Williams v. Taylor, . . . . . . . . . . . . . . . . . . 35-36
    (2000) 529 U.S. 362


**United State Constitution:**

Fifth Amendment . . . . . . . . . . . . . . . . . . . . 3

Sixth Amendment . . . . . . . . . . . . . . 2, 17-18, 38, 43

Fourteenth AAmendment . . . . . . . . . . . . . . . . 2-3, 38


**California Constitution:**

Article I, § 15 . . . . . . . . . . . . . . . . . . . . 2-3


**Evidence Code:**
§ 402 . . . . . . . . . . . . . . . . . . . . . . . . . 39

§ 1101(b) . . . . . . . . . . . . . . . . . . . . . . . 49

TABLE OF AUTHORITIES(Continued)

**CALJIC Instructions:**                                      **Page:**

No. 5.10 . . . . . . . . . . . . . . . . . . . . . . . . 44

No. 5.16 . . . . . . . . . . . . . . . . . . . . . . . . 44

No. 5.43 . . . . . . . . . . . . . . . . . . . . . . . . 44

No. 8.11 . . . . . . . . . . . . . . . . . . . . . . 28-29

No. 8.20 . . . . . . . . . . . . . . . . . . . . . . . . 28


**California Penal Code:**

§ 187(a) . . . . . . . . . . . . . . . . . . . . . . 2, 29

§ 188 . . . . . . . . . . . . . . . . . . . . . . . . . 28

§ 189 . . . . . . . . . . . . . . . . . . . . . . . . . 28

§ 866 . . . . . . . . . . . . . . . . . . . . . . . . . 48

§ 866(a) . . . . . . . . . . . . . . . . . . . . . . . . 47

§ 872 . . . . . . . . . . . . . . . . . . . . . . . . . 47

§ 995 . . . . . . . . . . . . . . . . . . . . . . . . . 45

§ 1258 . . . . . . . . . . . . . . . . . . . . . . . 4, 53

§ 12022.5(a) . . . . . . . . . . . . . . . . . . . . . . 5

§ 12022.55 . . . . . . . . . . . . . . . . . . . . . . . 5

§ 12202.5(a) . . . . . . . . . . . . . . . . . . . . . 2, 5


**Code of Civil Procedure:**

§ 2015.5 . . . . . . . . . . . . . . . . . . . . . . . . 52


**Title 18 U.S.C.**

§ 3006A(a)(2)(B) . . . . . . . . . . . . . . . . . . . . 4

**Title 28 U.S.C.**

§ 1746 . . . . . . . . . . . . . . . . . . . . . . . . . 52

§ 2254 . . . . . . . . . . . . . . . . . . . . . . . . . 1

TABLE OF AUTHORITIES(Continued)

## Title 28 U.S.C.(Continued)                                      Page:

§ 2254(d) . . . . . . . . . . . . . . . . . . . . . .   35-36

§ 2254(d)(1) . . . . . . . . . . . . . . . . . . . . .   35-36

Exhibits A through E, attached

Verification/Proof of Service By Mail, attached

Exhibit List:

Exhibit A: Court of Appeal, 2d.App.Div.Two Opinion, Dated July 23, 1998 12 pages;

Exhibit B: Reporter's Transcript pp. 783 and 799, total 2 pages;

Exhibit C: Clerk's Transcript pp. 331-336, and Reporter's Transcript p. 795, total 3 pages;

Exhibit D: District Court Docket Sheets in re 2:00-cv-10363-AHM-AIJ, of 6 pages;

Exhibit E: Documents, letter, Reporter's Transcript p. 794, and four p. of notes, in regards to sanity/competency claims, total 8 pages.

## MEMORANDUM OF POINTS AND AUTHORITIES

### FACTUAL BACKGROUND

I. Procedural Background:

On August 1, 1995, petitioner Errol D. Smith was charged by Felony Complaint (hereinafter "petitioner") alleging one violation of Penal Code, section 187(A)(murder). It was further alleged that petitioner used a firearm within the meaning of 12202.5(a) and discharged a firearm from a motor vehicle causing injury and death in violation of section 12022.55. There were no codefendants.

After a trial by jury, petitioner was convicted of second degree murder and the section 12022.5(a) enhancement allegation was found to be true. (RT pp. 751-752). Petitioner was then sentenced to fifteen (15) years to life on the substantive count, with an additional consecutive four (4) year term imposed on the firearm enhancement, for a total term of nineteen (19) years to life. (CT 547; RT 814). Notice of Appeal was timely filed. (CT p. 548).

On July 23, 1998, the Second Appellate District, Division Two, affirmed the judgment.

II. THE EVIDENCE PRESENTED IN THIS CASE

A. The Defense Case:

1. Introduction:

On the date of March 21, 1995, sometime after 3:05 p.m. and before 3:21 p.m., the shooting of Justin Richard, age 12 years old, had occurred. Jared Richards and his brother were on a RTD bus going home and just about to exit the bus. They reached the intersection of Lincoln and Altadena, in Altadena, where the bus had stopped at a diffe-

5.

rent location than usual. The two brothers, and other children exited the bus. Jared recalled later that when he heard gunshots he ducked, when he saw his brother lying down with a gunshot wound in the middle of his forehead. A nun from a nearby church came to help, followed by the arrival and departure of an ambulance which transported Justin to the Huntington Hospital where he passed away.

The evidence shows that Justin was the victim of a strayed bullet and that there was no other association between Justin and the person who shot the gun producing the fatal bullet from a considerable distance. (RT 352-370, 374-378).

2. The Crime Scene at Altadena and Lincoln Intersection:

A. Surveillance Conducted by Officer Patrick Tapia:

On March 21, 1995, petitioner Smith's residence was under surveillance by an undercover team of Sheriff's deputies for a possible involvement in a burglary. The deputies commenced their surveillance at about 10:25 a.m., and petitioner left his residence by car around 11:00 a.m. accompanied by a male passenger. Petitioner drove to the area of Altadena Drive and Lincoln. Later testimony and tape recorder statements revealed that the person in the car with petitioner was his cousin, Steven.

It was a Tuesday, and Steven left the car and went into the George's Liquor Store. Apparently, petitioner went into the store for two minutes or so, when he returned to his car and waited for Steven to return to the Honda vehicle. Apparently there are dual surveillance teams at this area. First, there is the Sheriff's burglary investigation team. Second, there is an unrelated investigation ongoing at the area where the incident occurred. Officer Patrick Tapia was conduct-

6.

ing  the investigation at the area when he observed petitioner driving a  brown-Honda  at the intersection of Altadena and Lincoln.  He noted that petitioner pulled his car into the driveway of George's Liquor on the  Lincoln  side.  There was a passenger in the car with petitioner, whom  we learned was petitioner's cousin, Steven.  There were men near petitioner's  car, but Officer Tapia's view was momentarily obstructed by an RTD bus and he could not tell if the "men" approached petitioner or not.  (RT 463-469).

After  the  time  when petitioner went into the Liquor store with Steven,  returned to his car without Steven just two minutes later, he pulled out of the car-stall and drove through the parking lot with his cousin still in the store.  Officer Tapia claimed that he then saw pe-titioner stop the car and converse with two men, but he did not obser-ve any  type  of  confrontation.  As it turned out, Officer Tapia left the area, and about ten minutes later he was informed that there was a shooting near George's Liquor.  (RT 469-477, 480).

B. <u>Responding Sheriff's Deputies Gutierrez and Curry</u>:

At the  time  of the incident, Deputy Sheriff Francisco Gutierrez and  his  partner, Deputy Curry, responded to the location.  When they arrived,  Deputy  Gutierrez  observed  numerous people standing at the corner of Altadena Drive and Lincoln in front of George's Liquors.  He saw  a  child lying on the ground bleeding from a head wound.  Minutes later, the paramedicts arrived and transported 12 year old Justin Ric-hard to the Huntington Hospital.  Dep. Gutierrez spoke with Jared  who told  the  deputy that the wounded boy was his brother.  (RT 380-385).

Dep. Gutierrez subsequently learned that at the time of the shoo-ting there had been an assault on a silver-colored Honda and its  pas-

7.

sengers, near the Liquor store where the boy was shot.  (RT 388).

C. Witness/Victim Alisha Rosses:

At  approximately 3:15 p.m., Alisha Rosses was driving her silver colored  Honda-Civic on  Lincoln, when she approached the intersection in front of George's Liquor.  There, she observed a group of young men surrounded  her car and began throwing rocks at it.  Alisha recognized one of the individuals and identified him as Keethie.  He called her a "slob bitch"  which is a name that Crips call members of the Bloods, a rival gang.

As she  made  a U-turn, one of the assailants swung his arm into her car and struck Thomas Wayne, who was her passenger.  By that time, they were stopped in the middle of the intersection.  Wayne got out of the  Honda  and  actually  chased the men, while Alisha simultaneously pulled  her  car  into an adjacent parking lot.  Keethie, along with a second man,  continued  to assault Alisha's car.  Keethie got  on  the hood and jumped through the windshield, shattering it.  At some point, Alisha was hit in the back with a brick.  Other young men, in a diffe-rent  car,  jumped  out and joined Keethie in the assault.  There were approximately 10 to 13 individuals around her car.  While all this was going on,  petitioner had drove from the front of the Liquor store and to  an area where he had backed into a car-space, at the same time the disturbance  was  simultaneously going on at the northeast corner, and to  the south where petitioner eventually found some refuge.  In fact, even  after he had parked himself away from the violence and was wait-ing for his cousin to exit the Liquor store, petitioner was not obser-ved  for a time, for the deputies attention was called to the disturb-ance.  As one deputy put it: "[P]eople were beating on a silver Honda,

8.

and somebody has a bat and it looks like there's some rocks" and "they were beating it with a baseball bat," a windshield was smashed with a bat, rocks were thrown at the persons in the Honda, "and somebody was jumping on the hood." Other persons were kicking on the sides of the Honda. The deputy saw a group of at least seven doing this. The group was also described by the same deputy as "more than seven." One of the deputies was instructed to call for other deputies to handle the situation, although she was to monitor it. No one from the surveillance team attempted to do anything about this except to call-it-in as "vandalism."

Alisha grabbed a stick to defend herself, but Wayne told her to drive off. After Alisha pulled out of the lot, three of the men got into a car. She didn't see where the rest of the men went. As she in fact drove away, she heard gunshots. Alisha knew Keethie was a member of the Crips, but she testified that she was not frightened by the encounter. (RT 393-407, 410-411).

D. **Witness Prunella Daniels:**

As this gang-disorder-assault was in progress, Prunella Daniels and her young daughter pulled into the parking lot near Lincoln and Altadena to get something from the store. As she drove in, she noticed groups of people standing on the corner focused a group of teenagers throwing rocks at a car. Daniels and her daughter entered the store and continued to observe the incident. The young men, who were dressed like gang-members, were taunting a couple in a car, throwing rocks and yelling profanities. The couple were able to back up their car and get out of the area. A few moments later, Daniels heard gunshots. She saw Justin, whom she knew from the neighborhood park pro-

9.

gram, get hit by one of the bullets. She did not see who fired the gun or the direction of the shooter. (RT 442-454). To place this in a perspective, immediately after the Honda started to drive away into a westerly direction on Altadena, several young teenager males ran from the area of the Honda and entered a blue and white Cutlass that was parked to the east of the Honda and drove in a southwestern direction but turned down Lincoln. Others involved at the Honda did not get in-to the Cutlass. The events were so erratic that it was difficult just to affirm where everyone was coming and going from in the proximity as to the moment before, during or just after 2, or 3 or 4 gunshots were heard. It was affirmed that before even any of the cars or persons had fled from the area that the gunshots had erupted, because we know from witness Alisha that she not only heard the gunshots but that she heard these sounds just as she was driving away; that it was witness Daniels who both heard the gunshots and saw Justin fall.

Later during the homicide investigation, one of the officers had paced off the distance of 80 yards from where petitioner's car had been parked to where Justin had fell. Both the Honda and the Cutlass were immediately followed by Sheriff's deputies. Four to five minutes later, the Cutlass was stopped and detained, with five persons in it. The only possible weapon they found in the Cutlass was the baseball bat. About fifteen minutes later the silver Honda was detained with no weapons found in it.

E. **Witness Nona Hatamian:**

Nona Hatamian was driving with a friend down Altadena. When her car approached the corner of Altadena and Lincoln, Hatamian saw 12 to 15 teenagers attacking a silver Honda with the throwing of bottles,

10.

bricks and stones. The attackers had surrounded the Honda and the two occupants of the Honda were moving slowly, trying to get away from their attackers. (RT 486-490, 507).

Approximately eighty feet away, Hatamian observed a young black man standing next to a brownish colored Honda. The man had his arms braced on top of the door, and he was holding a black handgun. (See RT 491-493, 512). As the silver-Honda was inching toward the intersection, Hatamian heard gunshots and believed the target of the shooting to be that of the silver-Honda. Even after the moment that the shots were fired, those involved continued to run towards the silver-Honda and continued to assault the occupants. Some of the attackers got on top of the car while others were banging it with their fists or throw-rocks at it. By the time that the silver-Honda made its way into the intersection, half of the attackers were still with the car, and the others had backed off. (RT pp. 501-517).

Hatamian moved through the area as quickly as she could. Once she took her friend home, she then returned to the scene and told a detective what she had observed. However, when Hatamian was interviewed the day of the incident, she stated to Officer Daniel Ploch that the person who did the shooting was sitting in the driver's seat of a brown-Honda. She never mentioned that the shooter got out of the car. More succinctly, she stated that he was leaning out the driver's side window and fired twice. (RT 619-624). This would be inconsistent with the evidence that the person doing the shooting had shot four rounds, not just two. Hatamian did not find out there that there had been a victim of the shooting until later that evening. (RT 494-496).

//

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

CV - 69 (5/98)

F. Detectives John Gentzvein and David Kushner:

Detective Gentzvein and his partner, Detective Kushner, were assigned to investigate the shooting and resulting homicide. Gentzvein was called to the scene at approximately 7:00 p.m. At that time, he learned that the victim, Justin Richard, had been shot in front of George's Liquor. Gentzvein surveyed the crime scene, took photographs and collected evidence.

He observed four shell casings from a 380 caliber semiautomatic pistol. The casings were retrieved and booked into evidence. The officers also recovered rocks, including one the size of a softball, which were located near the spot where petitioner's car was parked. The majority of the rocks were recovered in the area of the silver Honda. (RT 542-548, 551-553, 571-572). Gentzvein also retrieved the projectile from the coroner's office. He took the single bullet, along with the recovered spent-shell casings to the Sheriff's Crime Laboratory Firearms Unit for testing. (RT p. 555).

G. Arrest and Mirandized Interview of Petitioner:

Later in the investigation, Gentzvein learned that petitioner had been taken into police custody. Detectives Gentzvein and Kushner went to the Crescenta Valley Police Station to conduct an interview. Petitioner was forthcoming with the truth and facts sufficient to clarify what the police suspected. He admitted, "I really got myself into some trouble this time." Petitioner asked the police if "self-defense" could be an issue. Petitioner was then advised of his Miranda rights, though he stated that he did not want an attorney, and cooperated with the detectives in every way that he could. He agreed to be interview-

12.

ed on tape and subsequently told the officers that he had fired the gun in self defense.

Petitioner admitted to carrying the loaded gun in his car. He explained that during the time of the incidents that some of the teenagers had tried to harm him, tried to provoke a response from him, at the time that the group of teenagers thumped and banged on the window. Petitioner explained that there were a "bunch of them, aged 18 or 19, were involved in the (silver) Honda incident, and were throwing bricks at it." He described it as "whole rioting section" and it was "just coming out of everywhere" and that the men were dressed like "hoodlums" and "gangsters and gang members." He said that he observed what they did to the silver-Honda. He admitted to his carrying of the pistol because he had been in a lot of previously bad situations before, and that he had been jumped a bunch of times, being at the wrong place at the wrong time. He said that he resided in the Meadows, and referred to it as "a place that's real bad as far as gang activity."

During questioning, petitioner admitted that when he fired the handgun, he was seated in the car. It was petitioner's perception the incident was going to escalate just as soon as the other men were done attacking the silver-Honda that they would then come over and help finish off assaulting petitioner's Honda. Petitioner told the officer "I couldn't hit one, you know. I was just trying to scare them because they were real close to my car. I could have easily hit one of them, I just pointed [the gun] away. I shot four times, just to let them know to back off." He was merely trying to scare them, petitioner had said.

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY
CV - 69 (5/98)

Petitioner further told the police exactly where he had placed the handgun, and took them to an apartment attic area in Pasadena. The police recovered the 380 semiautomatic handgun without incident whatsoever. Officer Gentzvein had a arms expert test fire the gun and then compared the projectile in the gun with the projectile recovered from the victim's head. (RT 556-565).

Petitioner said that he did not intend on shooting anyone, but he said he felt threatened by the Crips, who he said tried to get in his car, and believed they wanted to take his car. Petitioner did not know the decedent-victim and had no reason to harm him. He only acted out of fear and wanted nothing more than to scare the men away from his car.

H. **Firearm Evidence is Undisputed**:

Dale Higashi, a Criminalist for the Los Angeles Sheriff's Department, and claimed to be an expert in the area of firearms, received the handgun, which was a Davis-380 caliber, which included a 380 caliber single bullet taken from the victim. He testified that after conducting tests, he determined that the bullet had been fired from the gun recovered from petitioner. (RT 604-607).

I. **Undisputed Facts Leading Up to Conviction**:

There are seven (7) poignant and overwhelming factors which are both undisputed inasmuch as they are mitigating in this case:

1. Evidence that petitioner went to the George's Liquor store with his cousin Steven, and parked in a convenient and accessible car space just outside of the store entrance was circumstantial to the fact that neither petitioner nor his cousin expected trouble or violence during the short interim they would be at that store;

14.

2. The evidence shows that both petitioner and Steven initially entered George's Liquor store together. Petitioner remained in the store for about two minutes, when he left the store and waited for Steve in the brown-Honda car. Petitioner, as well as countless of others in the immediate area of the Liquor store observed the violent acts committed by an entire mob of teenager gang-bangers against a silver-Honda which was being assaulted in the middle of an intersection in a rioting gang frenzy. Petitioner, who was familiar with being the victim of violence, enough that he purchased and carried a handgun with him, wanted to avoid the trouble he was then witnessing, drove to a remote and obscured corner of the small parking lot where he continued to wait for Steven;

3. Petitioner observed the violence unfolding before his eyes gave him the fear of imminent peril in the event he and his cousin, Steven, did not get out of the area immediately, he sat in the car, with his handgun and waited for his cousin to return to the car so they could leave without confrontation with the gang-bangers;

4. The gun in question was one that petitioner purchased from a gun store after waiting the fifteen days period and by receipt. He made the purchase for "protection" only;

5. Evidence that he was the person who shot the gun, his own admissions that he acted out of reasonable (though unjustified) fear at the time that he reacted to the vicinity incidents as they unfolded around him, and that he shot the gun in a fashion to scare those who were congregating and confronting petitioner in a fashion to infer the potentiality of assault and making petitioner the subject of multiple hatreds;

15.

---

6. Petitioner certainly did not know the victim, and harbored no reason to harm a juvenile who had just then exited the city RTD bus, a distance which was paced-off by a county official at about 80-yards supports the defense contention that petitioner's brandishing of his gun and shooting the four rounds was consistent with the at random-ness inasmuch as it also pertained to the straying nature of its un-fortunate and unintended trajectory;

7. Petitioner instantly, and simultaneously, cooperated with the city and county policing agencies. He particularly showed the police the place where he put the handgun, and clarified the question of whether or not he had shot two, three or four gunshots.

## ARGUMENT

### I.

PETITIONER ACTED OUT OF REASONABLE (THOUGH UNJUSTIFIED) FEAR AT THE TIME OF THE SHOOTING AND THE LAW SHOULD HAVE RECOGNI-ZED THE JUSTIFICATION OF SELF-DEFENSE BASED UPON THE SITUAT-ION AS IT APPEARED TO PETITIONER AT THE TIME OF THE INCIDENT

Petitioner was represented by counsel whom delivered ineffective assistance of counsel throughout practically all of his trial. The petitioner was deprived of due process, a fair trial and the right to present a defense of proper regard when his attorney failed to per-fect it before the jury.

A. The Waiver Chimera:

Respondent would argue that all of petitioner's contentions on this point, including petitioner's federal constitutional claims, have been waived and are the mere subject of a theorized procedural defaults. To reach such a distinction, one would have ignored the fundamental fact that the tender of evidence in this case and the re-quest for instructions embodying a theory of defense predicated on

16.

that evidence is the quintessence of the Sixth Amendment action.  The entire point in trial counsel's performance in this regard was to effectuate the Sixth Amendment guarantees the assistance of counsel and a fair trial.

Even the Appellate Court review of this matter categorically ignored the basic tenent of both state and federal law that the failure to  instruct, may it have been due to ineffective assistance of counsel,  the  trial court's refusal to permit the desired CALJIC, or the trial  court's  inactive sua sponte duty makes no difference where it fails to instruct on a defendant's theory of the case upon sufficient evidence, inherently violates the Sixth Amendment. (See United States v. Zuniga,  6 F.3d 569,  at  571-72 (9th Cir. 1993); United States v. Unruh,  855 F.2d 1363,  at 1372 (9th Cir. 1988); and United States v. Escobar de Bright,  742 F.2d 1196,  at 1201-1202 (9th Cir. 1984) ("The right  to  have  the  jury instructed as to defendant's theory of the case is one of those rights 'so basic to a fair trial' that the failure  to  instruct where there is  evidence to support the instruction can never be considered harmless error").

The cases and arguments cited by the Appellate Court do not support  the waiver arguments.  There is qualitative differences between a failure to articulate these various objections to the prosecution's evidence,  on  one  hand,  versus the full exclusion of an affirmative presentation of  the evidence and the request for a jury instruction on  the  defense theory  of the case.  The point of the rule noted in People v. Hines (1997) 15 Cal.4th 997, is that the trial court cannot be properly expected to divide all of defendant's potentially numero-

17.

us grounds for exclusion of conversing evidence. On the other hand, there is one and only one reason that a defendant presents evidence and requests a jury instruction on his theory of the case, i.e., to obtain a fair trial guaranteed by the Sixth Amendment. Similarly, People v. Holt (1997) 15 Cal.4th 619 and People v. Alvarez (1996) 14 Cal.4th 155, relate to a failure to properly or adequately preserve a basis of an objection to prosecution evidence. Each of these three cases, Hines, Holt, and Alvarez, supra, are tied to California Evidence Code 353, which states that:

> ". . . a verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: (a) there appears on the record an objection to or a motion to exclude or strike the evidence that was timely made so stated as to make clear the specific ground of the objection or motion . . . "

Hines noted that the "reason for this rule is clear" - "failure to identify the specific ground of objection denies the opposing party the opportunity to offer evidence to cure the asserted defect," (Id. at 15 Cal.4th 666) a rationality entirely inapplicable here.

B. **Overview:**

The appellate court's ruling on the merits was premised on a purported view that there was insufficient showing that the jury did not "buy defendant's argument" (Op. at p. 11, ¶5), to warrant the imperfect self-defense instruction. The appellate court attempts to take up this cudgel, and beats the concept of imminent peril far beyond recognition . . . knowing, as the appellate court certainly did know, that the evidence pointed without waiver to the fact that petitioner was in the vicinity of a riot jumping off just 50 to 60 feet from his car, enough that while he waited for his cousin to leave the

18.

liquor store that he decided it best to obscure himself away in the most remote area of the small parking lot that he could find and from that vantage point he could feel some degree of refuge from what he saw going on around him. Moreover, as will be discussed in sufficient detail infra, there is virtually no rationale to believe that petitioner shot his gun for any other reason than just what he claimed when he admitted to the police that he was the person who did shoot the gun that became fatal for another person just 80 yards away.

To reach this distinction in law, we must poignantly reach each one of the elements to define just what petitioner's (a) culpability, (b) state of mind, and (c) and ability to conduct. We cannot draw theorized and speculative conclusions merely to dilute the facts and truths just to sustain the justification that petitioner had actual "malice" in the act of second degree murder.

The basic flaws in the appellate court decision are slightly too many to narrate here, though it is readily mirrored when close scrutiny is given a reading of the opinion and a comparison of what the jury hung their hats upon. The jury erroneously focused on petitioner's mental state or the degree of fear or any existence of imminent peril <u>when petitioner was inside his brown-Honda with the gun in his lap</u> because petitioner was not right in the mix of the riotous activity. The evidence reviewed by the appellate court suggests that it was petitioner who first signaled the two men to his car, while the record on the matter cannot define what the gesture meant in definitive meanings. The appeallate court opined that petitioner was smiling when the two men approached his car, while there were no witnesses close enough to define whether or not he was smiling, and even for

19.

sake of argument that he was smiling, what do we glean from it enough
to identify what association petitioner had with the two men who con-
fronted him at his car.

The evidence shows that petitioner was under surveillance from
the time he left his residence and during the time he was at the Geo-
ge's Liquor store. Officer Patrick Tapia was also observing petitio-
ner in the parking lot area and from the very moment that petitioner
drove into the parking lot the officer observed two men in the immed-
iate area of petitioner, though could not establish contact because
the view was obstructed by an RTD bus. (RT 463-469). Officer Tapia
then observed petitioner drive through the parking lot to another lo-
cation and petitioner had stopped and conversed with two men, though
Tapia could not make out what type of conversation petitioner had
with the men. However, by the time the appellate court reviewed the
same facts, the court incorporates their opinions that the conversat-
ion was friendly while knowing, as the court did know, that there was
no means to substantiate its findings thereof. It is always easy for
a court to point to some other reason to disclaim any wrong or trial
error. The court also failed to instruct on petitioner's mental
state from having been previously assaulted by gang-bangers and hav-
ing had problems in the past with local gang members, enough that he
purchased a handgun for his own protection.

The trial court's apparent ruling was that because the riotous
incidents were taking place in front of the liquor store, petitioner
being 50 to 60 feet from where it was occurring, that he was not in
any imminent peril, at least not at that subsequent point in time. It
is at this point that the court ran afoul of the evidence. The trial

20.

court had no way whatsoever to know petitioner's state of mind, just how well he was conforming, thinking, expecting or believing what was going to happen if that riotous activity found him parked directly in front of the George's Liquor store. The strongest of likelihood for his decision to park his car away from the front of that liquor store was rationally linked to the fact that he feared the violence that in fact was unfolding nearest to him. We need to take some stock in the fact that where petitioner first parked his car was in front of the liquor store just some 10 to 16 feet away from where the silver-Honda was being attacked by an angry and violence-prone mob of gang-banging teenagers. This, alone, well established "fear" into petitioner, and which it was categorically enough fear that he decided to relocate his vehicle to the other side of the parking area, where he was then 50 to 60 feet from the erupting violence.

The circumstances of the matters in this case have not withstood the fundamental principles embodied in California Penal Code section 20, that "in every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence." You simply cannot look at this from the perspective of petitioner putting himself in the actual circumstances and saying at that point that he has created the imminent peril, that imminent danger that was posed just on the exterior area of that parking lot, nearest to the liquor store, itself. It has to be looked at from the objective facts, and the objective facts do not cause a reasonable person to discount the fear of danger, even imminent danger, when a person is that close to erupting violence. Petitioner was at that liquor store with his cousin to make a purchase, and not to be exposed to two men asking him

21.

"who" he was and then a few moments later two other men come to his car and attempt to get in or have petitioner get out.

Any finding which determines whether or not petitioner placed himself in the position, would be a red herring opinion. Christain S. placed himself in a position of a confrontation with the eventual decedent by going to the beach, and by walking away pace by pace as the eventual decedents approached him. The actual point of law which the court should have addressed, and then resolved in petitioner's favor, is that raised in In re Christian S., supra, 7 Cal.4th 768, fn. 1, i. e., whether the defendant had fomented a confrontation by assaultive or felonious conduct.

Petitioner's statements to the police was that he simply tried to retreat from the area of the liquor store, but could not leave because he was still waiting for his cousin to exit the liquor store and return to his car. Maintaining a loaded firearm for protection is reasonably equated to as an American "custom" normally associated with homestaed laws. Neither the trial court nor the appellate court acknowledges that petitioner's conduct of sitting in that parking lot in a point of refuge with a loaded weapon was, under their version of the events, entirely legal and in no way a disqualification to an imperfect self-defense. The trial court thus confounded its analysis of the sufficiency of the evidence for imperfect self-defense, and fatally floundered by then failing to make the decision based on the evidence and renderings of petitioner's state of mind at the time of the incident(s).

Perhaps a factor explaining the trial court and appellate court errors and certainly relevant to just what the respondent is expected

22.

to argue on Reply, is the underline current of venom and vilification directed toward petitioner, independent of his legal claims. In some way, the appellate court's position ultimately collapses into the moralistic bottom line that the sin of parricide is so heinous as to render frivolous petitioner's legal claims.

The Ninth Circuit Court has long held clarification to the trial court's failure, as was here, to instruct on a requested lesser included offense or proffered CALJIC supported by evidence raises a constitutional question precisely because ". . . the criminal defendant is also entitled to adequate instructions on his or her theory of the case." (Bashor v. Risley, 730 F.2d 1228, at 1240 (9th Cir. 1984).

The court reaffirmed the amended and final rule in 2000. "It is well established that a criminal defendant is entitled to adequate instructions on the defense theory of the case." (Conde v. Henry, 198 F.3d 734, Id. at [7], p. 739 (9th Cir. 2000), internal citations United States v. Mason, 902 F.2d 1434, at 1438 (9th Cir. 1990)("A defendant is entitled to have the judge instruct the jury on his theory of defense, provided that it is supported by law and has some foundation in the evidence."). This rule also arises out of the fundamental constitutional principle that a court may not deprive a defendant of "an adequate opportunity to present [his] claim fairly within the adversary system." (Rose v. Moffitt, 417 U.S. 600, at 612 (1974).)

C. The Appellate Court's Incorrect Analysis of the Law:

The appellate court's attempt to distinguish the cases in which an imperfect self-defense instruction was required. The purported ground is that in other cases, the defendant and the victim were at all relevant times in close proximity to each other and the victim in

23.

fact made some ambiguous movement or said something that could be construed as a threat. However, the facts in petitioner's case are even stronger, though in another way. There was ample testimony that petitioner had initially parked his car directly in front of the liquor store, though petitioner claimed that while he was waiting for Steven (his cousin, to come out of the store) that he witnessed the violence taking place just 10 to 14 feet from him in the matter of the silver-Honda assault. That because of the riotous conduct, the large number of those who were involved in throwing rocks, bottles, and the smashing of the windshield of the silver-Honda, convinced petitioner that it was time for him to leave. Still, petitioner had to wait for his cousin. At this point petitioner drove to the other side and in the corner "out of the way, sorta" petitioner took refuge during the time that he continued waiting for his cousin to exit the liquor store. Though petitioner's efforts were to no avail; he was observed by others (at least two of the gang members) who noticed the deliberateness of petitioner's movement of the vehicle from one area of the parking lot to the most remote available space. The two men went to the secondary spot and confronted petitioner, saying things which police surveillance were unable to detect. When the two men had told petitioner to open the car door, to get out of the car and asked him what gang he was from. Petitioner told the men to back away from his car and to leave him alone, when at least one of the two men then started to pound on the window with a closed fist, when the other man hit the door handle with a rock. This was similar, if not identical conduct to what the gang-bangers had done, and were still doing, to the other Honda in front of the liquor store and petitioner was afr-

24.

aid for his life, his person, afraid for Steve, and afraid to the ex-
tent that he brandished his handgun and shot it four times in a way
to let both of the men know that he was not going along with their
plans to harm petitioner. Petitioner was also adamant not to let the
men take his car. Fair enough that petitioner was afraid. He obser-
ved the activities unfolding around him and had seen first hand what
the area lawlessness exampled -- but the point overlooked by the tri-
al court is that petitioner did not fire the handgun in the direction
of the two men who were confronting him. Instead, petitioner aimed
the gun to the side and fired it four times. It would have been a
far different case where petitioner knew where the victim was at just
prior to the fatal shooting, or that he even knew there was anyone in
the path of that fatal shot, gunshots which were admittedly reckless
when petitioner shot the gun without regard to what damage the bullet
or bullets could cause, because he was frightened, himself.

Indeed, if Christian S., supra, 7 Cal.4th 768, had lobbed bul-
lets at the eventual decedent from a distance within his firearm's
range, but far exceeding the 80 yards of separation occurring at the
time of the actual fatal shooting, Christian S., would not have been
entitled to an imperfect self-defense instruction, no matter how pet-
rified he actually felt at the time he fired the shots.

Next, the trial court refused to consider the evidence of immin-
ent peril existed at a subsequent point of time, i.e., when petitio-
ner was parked directly in front of the liquor store, which was much
closer in proximity to the victim than from the place where he shot
the handgun four times. From petitioner's arrest to his trial, these
proceedings have always attempted to minimize the facts when analyzed

in proper context, demonstrates that petitioner believed not only  in a  threat of imminent peril from the first two men, or the second two men,  or from the numerous other persons who were rioting in the same area where petitioner was at, but also a scenario which was specific, hostile, and of which he was a target of the gang immediately preceding the moment when the two men demanded petitioner to get out of his car and petitioner's shooting of his handgun to "scare" the men away.

Given the facts in this case, the jury should have found petitioner honestly believed that his life and person was in danger and had acted in accordance with that belief."  (Id. 328).

In this instant case, the second degree murder conviction failed to constitute a viable crime and was not supported by substantial evidence.  There was virtually no  affirmative evidence that petitioner had  any homicidal intent whatsoever toward Justin Richards.  This is certainly  the  case of petitioner's fears and resulting recklessness when he shot  a gun to "one side" in front of two men who had freaked him  out  to the extent he thought a "violent encounter was imminent" and  a  real  expectation of what was to happen to him and his cousin Steven.  Petitioner gave a statement that seeing the riotous incident unfolding  in front of the liquor store, just 10 to 14 feet from him, provoked  such  a  hightened fear response that he actually moved his automobile  to  the other side of the parking lot and into a secluded corner.  When petitioner was parked in such a point of believed refuge and was still confronted by two of the gang-bangers, he brandished his handgun in a fashion to scare his antagonists away.  The parallel between  petitioner's  case and an accident involving a gun could not be more clear.

26.

Where a Fourth of July festivity presents the shooting of a hand gun into the evening sky and gravity returns that same bullet to a fatal impact, is tantamount to this instant case where neither of the shooters ever expected that the handgun would have harmed anyone. The punishment range certainly must hold the responsible to accord this type of accident. Petitioner provided the police statements that at the time of the incident he was suffering from fear, clouded fear, mental trauma, hypervigilance, and other mental distortions resulting from this very incident. Mental state "reasonableness" in this case was judged by how the situation appeared to petitioner at the time, and not by what the witnesses may have believed or speculated upon.

This was also precisely why it was so critical that petitioner be allowed to have structured his defense, including his defense tactical efforts, in the manner most likely to bridge this credibility gap before the jury. For the foregoing reasons, petitioner should prevail on reversal and remand.

<u>ARGUMENT</u>

II.

**A CONVICTION FOR SECOND DEGREE MURDER CANNOT STAND WHERE THE WEIGHT OF THE EVIDENCE SHOWS THAT PETITIONER ACTED OUT OF AN HONEST BUT UNREASONABLE BELIEF THAT HE WAS IN IMMINENT DANGER OF DEATH OR GREAT BODILY INJURY**

Petitioner contends that his conviction for second degree murder must be reversed because he did not harbor the necessary malice aforethought to uphold his conviction. Petitioner respectfully requests this honorable Court to review the Court of Appeal decision, and which is attached hereto as Exhibit A, in light of <u>People v. Ceja</u> (1994) 26 Cal.App.4th 78, at 86; see also <u>In re Christian S.</u> (1994)

27.

supra, 7 Cal.4th 768, 783.[1]

In the Court of Appeal, petitioner demonstrated that under the facts of this case, he should have been convicted of manslaughter rather than secon degree murder since his actions were not taken with malice aforethought, which is a necessary element of second de-

---

1. In a murder case, mental illness can negate premeditated and deliberation, malice aforethought, or both these mental states. See People v. Rosenkrantz (1988) 198 Cal.App.3d 1187, 244 Cal.Rptr. 403. Which of these two alternatives occurs depends on the exact effect the mental illness has on each mental state. Of course, if malice aforethought is negated, the defendant is certainly not guilty of murder because that mental state (except in felony murder) is necessary in both degrees of murder. On the other hand, if only premeditation and deliberation are negated, the defendant can be found guilty of murder in the second degree.

Implied malice as well as express can be negated by both mental illness and intoxication. It is somewhat paradoxical that, in a killing resulting from the operation of a motor vehicle, intoxication can be used to both establish and negate implied malice. People v. Whitefield (1994) 7 Cal.4th 437, 450, 27 Cal.Rptr.2d 858.

Despite the fact that premeditation and deliberation require a more sophisticated mental activity than malice aforethought (see CALJIC Nos. 8.11 and 8.20), the Supreme Court has held that a person can premeditate and deliberate, yet be unable to harbor malice aforethought. People v. Sedeno (1974) 10 Cal.3d 703, at 723, 112 Cal.Rptr. 1, at p. 14.

Amendments to Penal Code sections 188-189 have abolished requirements developed by case law for the concepts of premeditation and malice aforethought as they related to diminished capacity. Under former law, a defendant alleged to have willfully deliberated and premeditated a crime had to be shown to have had the ability to "maturely and meaningfully reflect upon the gravity of [the] contemplated act." People v. Wolff (1964) 61 Cal.2d 795, 821, 40 Cal.Rptr. 271, at 287. That showing is no longer required. Penal Code section 189. In addition, when a defendant tried to rebut a prima facie showing of malice aforethought, the prosecution had to prove that the defendant as the time of the crime was committed was aware of the obligated to act within the general body of laws regulating society (People v. Conley (1966) 64 Cal.2d 310, 49 Cal.Rptr. 815), and that he or she acted despite that awareness (People v. Poddar (1974) 10 Cal.3d 750, at 760, 111 Cal.Rptr. 910, at 917). For further discussion of the intent required for various degrees of homicide, see 1 Witkin & Epstein, California Criminal Law sections 452-458, 470-476 (2nd Ed. 1988).

---

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

gree murder pursuant to Penal Code section 187(a). In order to sustain a conviction under this section, the prosecutor **must** prove beyond a reasonable doubt that: (1) petitioner had unlawfully killed a human being; and (2) the killing was done with malice aforethought.

In the instant case, there was neither "solid" nor "credible" evidence presented that would lead a reasonable juror to conclude that petitioner harbored "malice aforethought" when he shot the gun. Although it is undisputed that petitioner caused the death of Justin Richards; the facts disclose that petitioner was acting out of fear of his own safety and did not intend to kill anyone. Therefore, petitioner should not have been convicted of second degree murder, but rather the lesser included offense of manslaughter.

A. <u>Substantial Evidence to Support an Implied Finding of Malice is Lacking</u>:

Petitioner contends that had the jury carefully scrutinized the evidence, they would <u>not</u> have found him guilty of second degree murder because the killing was not done with "malice." The mental state constituting malice can either be "expressed or implied." Malice is poignantly implied when: (1) the killing resulted from an intentional act; (2) the act was deliberately performed with the knowledge of the danger to, and with conscious disregard for, human life. (Please see CALJIC 8.11).

Even for the sake of arguendo, where an act falls within the definition of "malice," a genuine but reasonably held belief in the need to defend negates the malice and reduces the offense from murder to manslaughter. (<u>People v. Ceja</u>, <u>supra</u>, 26 Cal.App.4th 78). In <u>In re Christian S.</u>, <u>supra</u>, 7 Cal.4th 768, the California Supreme Court

29.

concluded that "[w]hen the trier of fact finds that a defendant kill another person because the defendant actually but unreasonably believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and cannot be convicted of murder." (Id. at p. 783).

This is precisely what happened in petitioner's case. However, the underlying facts supporting petitioner's actual belief that he was in danger were entirely ignored by the jury.

On the day of the shooting, as discussed supra, petitioner and his cousin Steven, had driven to George's Liquor store. Petitioner and Steven went into the Liquor store, though petitioner came out first and Steven followed minutes later. Almost immediately, petitioner was confronted by two men who represented themselves as gang members and whom threatened petitioner. Petitioner drove out of the parking lot only to re-situate the car on the other side of the parking lot and in a remote corner where he waited for his cousin to exit the liquor store.

Petitioner sat in his car and from a distance of about 80 yards, petitioner observed the gang assault on two people in a silver-Honda where the gang members hurtled rocks, bottles, and repeatedly swung a baseball bat all over the vehicle. Two of the gang-bangers jumped up and down on the roof of the car, and another man kicked in the front windshield completely. Within minutes, the confrontation between the gang-bangers turned from harassment into a violent assault on the car and its occupants, and was seemingly just spilling over into the entire area. The trial court, itself, call the "assault" a "mini riot." (RT p. 653).

---

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

CV - 69 (5/98)

Although petitioner was not the initial target of the mob attack he informed officers that the gang members turned on him and began throwing objects in his direction. Indeed, one large rock, the size of a baseball was found near the location of petitioner's car as were smaller stones. (RT 551). It was only after petitioner felt threatened that he pulled out his gun and fired to "scare off" the gang members. Petitioner told the police that he carried the gun in his car because he lived in a tough area affected by gangs, and he had been jumped by gang members in the past.

When he left the scene of the riotous assaults, he didn't know at the time that one of the bullets fired from his gun had struck and killed a child. After he was taken into custody, he cooperated with the officers and stated that he would talk to the officers without an attorney present. In his taped interview, petitioner admitted to the firing of the gun. He told the police that the gang members were beginning to throw rocks at his car, and he fired his gun to one side as an effort to scare them away. He did not intend to hit anyone. He further told the officers the location where he placed the gun. (RT pp. 563-565).

Petitioner's actions, when viewed in light of the surrounding circumstances, fully support his __subjective__ belief that he had acted reasonably under the circumstances. He was acting out of fear and did not contemplate the danger to other people. Moreover, the fact that he readily admitted to the shooting points squarely to an honest belief that he felt his life was in danger.

Gang violence is all too common, and only those who are actually confronted by it know only too well the terror it invokes. Petitio-

31.

ner, who stated that he had been "jumped in the past," carried the handgun for "self-protection." He was in a violent and sudden situation which quickly escalated and tragically, an innocent 12 year old boy was killed. Petitioner was responsible for the boy's death, but he harbored no intent or malice to injure the child or anyone else.

B. **Since There was Insufficient Evidence as to the Required Element of Malice, the Court of Appeal Erred When it Concluded There was Substantial Evidence to Support the Verdict:**

The Court of Appeal erred in its determination that the evidence in the case disclosed substantial evidence - that is, evidence which is at least reasonable, credible and of solid value - such that a reasonable trier of fact could find the defendant guilty beyond a "reasonable doubt." (<u>People v. Osband</u> (1996) 13 Cal.4th 622). Thus, the due process clause of the United States Constitution was not satisfied. (<u>People v. Virginia</u> (1979) 443 U.S. 307, at pp. 318-319).) Therefore, contrary to the finding of the Court of Appeal, the prosecution simply did not meet its burden to establish guilt beyond a reasonable doubt and review is necessary to secure justice in this case.

C. <u>The Court of Appeal Decision was Error</u>:

Every attorney handling criminal appeals and habeas post-collateral petitions knows that to overturn a conviction or punishment, a court must first find error and then decide that the error was prejudicial. Few appeals and habeas petitions have cleared these hurdles in the California state courts which in the past five years has found an extraordinary range of trial court errors to be harmless. The errors include egregious examples of improper admission or exclusion of evidence, prosecutorial misconduct, ineffective assistance of coun-

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

sel, faulty instructions, and jury misconduct. A closer look at these type of cases show that the reviewing courts have excused even blatant mistakes or errors that compromised the defendant's fundamental constitutional rights. Occasionally, the appellate court finds a mistake harmless by saying there wasn't sufficient proof that the jury's decision would have been different without the error. For instance, in <u>People v. Fierro</u> (1991) 1 Cal.4th 173, the judge had the defendant shackled even though there was no indication shackling was necessary. The court found the error harmless because the defendant couldn't show that the shackling tainted eyewitness identification.

There is no doubt that a determined appellate court can find virtually any mistake, any error or wrong, to be harmless. It is almost always possible to point to other evidence, to claim the wrong didn't really influence the jury verdict, or to contend that the defendant failed to prove a harmful effect. But no defendant can prove a verdict would have been different had the trial court error not occurred.

In <u>People v. Rowland</u> (1992) 4 Cal.4th 238, the judge instructed the jury in a penalty phase of a capital case that any attempt by the defendant to suppress evidence could be considered to show consciousness of guilt. The reviewing court acknowledged that the trial court erred but said that the jury probably ignored the instruction.

In <u>People v. Garceau</u> (1993) 6 Cal.4th 140, the trial court judge told the jury it could consider the defendant's past crimes for any purpose, including character assessment, in deciding whether he was guilty of two counts of first-degree murder. The law is absolutely clear that character evidence cannot be considered in determining

33.

whether a defendant committed a particular crime, and that the evidence of past crimes is admissible only as for such limited purposes as showing motive or a pattern in the crimes. Yet the reviewing court found the error harmless in light of the defendant's incriminating statements and the testimony of eyewitnesses.

Prosecutors, apparently, can say almost anything in closing arguments, no matter how inappropriate and inflammatory. In People v. Thomas (1992) 2 Cal.4th 489, for instance, the prosecutor in closing argument described the defendant as a "perverted murderous cancer" and a "walking depraved cancer." On appeal, the court said there was no indication the jury's decision to convict was based on passion rather than evidence.

Using a variety of rationales, a reviewing court rarely encounters an error or wrong that it cannot forgive. Most commonly it finds the error or wrong harmless by emphasizing all of the other evidence against the defendant.

Sometimes the reviewing court excused trial court error by doubting its effect on the jury. In People v. Anders (1990) 52 Cal.3d 453, the judge told the jury that the defendant's intent to kill was a "fairly simple question, and that it very likely would reach a special circumstances verdict on the first day of deliberation." The reviewing court admitted that the judge erred, but stated that the comments had not affected the jury's decision. In People v. Hawthorn (1992) 4 Cal.4th 24, the prosecution in a guilt phase argument claimed that it had a duty to present the truth but attorneys for the defense did not. The reviewing court decided that there was no likeliness that the jury failed to place that argument in proper focus,

34.

proper perspective, or that the objectionable comments had materially contributed to the verdict.

Any court's willingness to find such a variety of errors to be harmless or without merit whatsoever, only encourages the very sloppiness of prosecutors and trial judges alike. The appropriate remedy for violations of a defendant's rights is not to throw open the prison doors, but to overturn the conviction and remand the case. By doing so, this instant Court would hold trial judges, prosecutors, defense attorneys, and the jury accountable for safeguarding the defendant's right to a fair trial . . . and we should expect a far more rigorous review of these type of trial errors from the guardians of the criminal justice system in California.

D. <u>Consideration of Facts Which Are Irrelevant to the Habeas Claim, Wrong or Unreliable Because of the Absence of Process Designed to Reliably Determine Such Facts:</u>

Not surprisingly, the starting point for any analysis of § 2254 (d), must be the Supreme Court's decision in <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), where the Supreme Court applied § 2254(d)(1). In order to understand <u>Williams</u>' application, it is important to analyze in some detail both the facts and the state of the state court decisions involved.

Though speaking to the facts and circumstances of this case, the review takes focus on the appellate court's failure to consider evidence which should have been considered when addressing the quandary determination of whether or not malice played a role in petitioner's "criminal culpability." Here, petitioner asserts that the appellate court resolved the claim by considering facts which had no logical relevance to the claim of whether or not petitioner had malice at the

35.

time that he brandished the handgun and shot off four rounds -- in an exact converse of <u>Williams</u> -- the appellate court rationale should be considered unreasonable and the section 2254(d)(1) should not bar relief. Thus, § 2254(d) will not bar relief where, in resolving a constitutional claim, a state court either (1) fails to consider facts which it should consider or (2) considers facts which it should not consider. But even these two categories are not necessarily exclusive. As other courts have concluded, a state court's consideration of facts which are, as here, demonstrably wrong also shows that the state court decision is unreasonable; in this situation too, § 2254(d) will not bar relief. (Please see <u>Ellis v. Mullin</u>, 312 F.3d 1201 (10th Cir. 2002).)

For the above reasons, this Court is asked to settle the question of whether or not petitioner's circumstances had the clear and distinctive element of malice. Finding none, the case must remand to the trial court with instructions to accord.

<u>ARGUMENT</u>

III.

<u>ATTORNEY RICKARD SANTWIER PROVIDED PETITIONER INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HE FAILED TO PROPERLY PREPARE, INVESTIGATE, CALL WITNESSES TO THE TRIAL OR TO FILE A MOTION FOR A NEW TRIAL</u>

Petitioner claims that during the time that defense counsel served, that he failed to properly prepare the defense for purpose of trial; failed to investigate the presence of exculpatory witnesses to the incidents; had failed to interview a list of witnesses given to him or made known upon him and did not call any of the witnesses befor the trial of the matters.

The presentation of certain witnesses for the defense were astr-

36.

onomically critical because they would have testified to petitioner's demeanor and conduct at the time of the unintended shooting. Attorney Santwier did not conduct witness contacts or any collection of prospective testimonies and made no subsequent attempt to clarify whether or not malice was an actual element in the evidence against petitioner. Counsel also failed to contact or list the names of witnesses which were known to have been at the crime scene on the day of the shooting. (Please see Exhibit B).

There is no doubt that counsel's failure to investigate and interview witnesses constitutes ineffective assistance of counsel. See Holliness v. Estelle, 569 F.Supp. 146 (W.D. Tex 1983).

This was a case where counsel failed to interview or to present "potential" and "important" defense witnesses in line with the holding of In re Marquez (1992) 1 Cal.4th 584, at 596, 3 Cal.Rptr. 727. Counsel also failed to move for suppression of evidence in line with People v. Ledesma (1987) 43 Cal.3d 171, 233 Cal.Rptr. 404. Also see Hill v. Lockhart, 877 F.2d 698 (8th Cir. 1989) and Hill v. Lockhart, 894 F.2d 1009 (8th Cir. 1990). Counsel was aware of the names of the crucial witnesses though for reasons possibly only known to counsel, they were neither interviewed, contacted or called before the court for examination whatsoever.

Counsel failed to interview prosecution witnesses and in that failing he also did not interview two witnesses that provided evidence of petitioner's presence and conduct incident to before and during the shooting, and was entitled to an evidentiary hearing to resolve disputed and contradicting facts. (See Kemp v. Leggett, 635 F.2d 453 (5th Cir. 1981); counsel's failure to call or to interview

37.

eyewitnesses whose testimony would in fact corroborate petitioner's self-defense claim, fell below an objective standard of reasonableness. Had counsel called "one crime scene witness" to testify, a self-defense primary instruction could have been submitted to the jury. There is a reasonable probability that the jury might have in fact acquitted petitioner of the second degree murder, by either finding him guilty of a lesser included charge or by finding that he acted in self-defense. (See <u>Capps v. Sullivan</u>, 921 F.2d 260 (10th Cir. 1990); <u>United States v. Tucker</u>, 716 F.2d 576 (9th Cir. 1983); and <u>Code v. Montgomery</u>, 799 F.2d 1481 (11th Cir. 1986)(also note the violation of petitioner's Sixth and Fourteenth Amendment rights).)

<u>ARGUMENT</u>

IV.

<u>PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN ATTORNEY SANTWIER FAILED TO SUPPRESS HIS STATEMENT TO THE POLICE ON APPLICABLE GROUNDS WARRANTING SUPPRESSION</u>

Petitioner contends that his court appointed attorney, Mr. Sant-wier had initially interviewed with him and which they discussed the confidential circumstances of the case. That it was during this time which petitioner informed his attorney that when he was arrested by the police he was physically assaulted, repeatedly threatened and had received an unusual degree of coercion because the police did not want to "waste time." Further, petitioner informed his attorney that the arresting officials had also used racial slurs and racial name-calling. That all of the treatment was unlawful and was a means of which to amend petitioner's "will" towards cooperation and to circumvent petitioner's right to remain silent.

Petitioner asked his attorney to suppress the statements and the

38.

fruits of the resulting evidence because it was not willful, intended and he did not wish the statements to be evidence himself.

Counsel failed to perfect any motion to suppress or even such a motion to request that a (Evidence Code) §402-Hearing be conducted as an available procedure for determining the foundational and other preliminary facts surrounding the claims made by client, petitioner.

A. <u>Legal Discussion and Analysis</u>

1. <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966):

The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given. Assessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation; a warning is a clear cut fact. More important, whatever the background of the person interrogated, a warning at the time of the interrogation is indispensable to overcome its pressures and to insure that the individual knows he is free to exercise the privilege at that point in time.
(<u>Id</u>. at pp.468-469).

Police interrogators are well familiar with their obligation to the accused that they must be treated in a way that is decent, made to understand that the person being questioned has a right to <u>not</u> speak without the presence of an attorney. Though each of these rights, and all other related or peripheral rights become illusionary the very moment the police start to get physical, vent verbal and threatening

**39.**

racial slurs at the person being question as a means to wear down any expected resistance to the questioning session. What is equally as bad is when the "client" informs his "attorney" that these terrible things happened against him on the day of his arrest, and the attorney does nothing whatsoever to either investigate, review, examine and/or inspect the allegations in a judicial fashion. Certainly such allegations of this sort couldn't be the first time ever heard of against arresting officials in a shooting death of a minor.

The right to counsel is a fundamental right of criminal defendants; as it assures the fairness, and thus the legitimacy of our adversary process. The essence of an ineffective assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and the prosecution that the trial was rendered unfair and the verdict rendered suspect. (See <u>Kimmelman v. Morrison</u>, 477 U.S. 365, at 374 (1986).) This is exactly what petitioner contends in the scope of this claim. Because counsel failed to effectively respond to the allegations and evidence which petitioner tried to persuade counsel to act, the inactivity is categorically ineffective assistance of counsel. (Also see, <u>Edwards v. Arizona</u>, 451 U.S. 477, at pp. 484-485 (1981); and <u>Colorado v. Connelly</u>, 479 U.S. 157. at pp. 164, 166 (1986)(<u>U.S. v. Bradshaw</u>, 935 F.2d 295 (DC Cir. 1991); and <u>Derrick v. Peterson</u>, 924 F.2d 813, at 820 (9th Cir. 1990)(See Exhibit C).)

<u>ARGUMENT</u>

V.

<u>COUNSEL PROVIDED INEFFECTIVE ASSISTANCE WHEN HE FAILED TO PRESENT TESTIMONY ON SANITY ISSUE AT TRIAL</u>

Petitioner asserts that court appointed counsel, Mr. Santwier, in fact provided him ineffective assistance of counsel when he failed to

40.

research, understand, or to investigate the law based on petitioner's circumstances, and the failure to do so denied petitioner his right to a potential sanity defense. (Harich v. Wainwright, 813 F.2d 1082 (11th Cir. 1987)(coinsiding with Goodwin v. Balkcom, 684 F.2d 794 (11th Cir. 1982)(petitioner was also entitled to counsel investigating alternate lines of defense, Miller v. Wainwright, 798 F.2d 426 (11th Cir. 1986).)

Here, there was proper and reasonable cause for counsel to investigate and present expert testimony in the area pertaining to petitioner's sanity at the time of the incidents. Petitioner had been examined by a court appointed psychiatrist, whose reports generated an expert evaluation of petitioner's psychological state of mind at the time of the crime, though counsel claimed that because petitioner was acting as his own counsel when the evaluation was conducted, that he did not believe it incumbent upon him to do anything with respect to that matter or potential defense. (See Exhibit E).

There is no question that counsel's failure to investigate petitioner's mental state and present evidence at the trial based on petitioner's mental state constitutes a significant claim of ineffective assistance of counsel and warrants an evidentiary hearing. (U.S. v. Burrows 872 F.2d 915 (9th Cir. 1989)(failure to investigate petitioner's mental condition, where it was apparent from the crime itself and conversation with petitioner that he suffered from mental problems and heightened fear complex, which would also have constituted "mitigating evidence" before the jury, was ineffective assistance of counsel. The evidence of slight, moderate or severe sanity concerns which were known or unknown past, temporary, present or future is of no regard here because counsel for petitioner failed to properly investigate the potential san-

41.

ity defense. (Please also see <u>U.S. v. Cronic</u>, 466 U.S. 648, at pp. 654 (1984), "Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have.")(also see, <u>People v. Pope</u> (1979) 23 Cal.3d 412, at 424, 152 Cal.Rptr. 732, 739, counsel should have investigated the case sufficiently enough to be aware of all potential defenses of law and fact)(<u>People v. Cruz</u> (1980) 26 Cal.3d 233 162 Cal.Rptr. 1; <u>People v. Poddar</u> (1974) 10 Cal.3d 750, 111 Cal.Rptr. 910, inasmuch as it pertains to mental state of "malice aforethought") (moreover please review <u>People v. Whitfield</u> (1994) 7 Cal.4th 437, 27 Cal.Rptr.2d 858, ". . . whether or not the defendant . . .premeditated, deliberated, or harbored <u>express</u> malice aforethought").)

For the reasons discussed here, petitioner was denied effective assistance of counsel, and the entire judgment should be remanded for a new trial.

<u>ARGUMENT</u>

VI.

<u>PETITIONER SUFFERED GROSS INEFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL DENIED HIM HIS RIGHT TO TESTIFY ON HIS OWN BEHALF</u>

It cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his own defense. (See <u>Rock v. Arkansas</u>, 483 U.S. 44, at 49 (1987).) The Supreme Court has stated that although trial counsel has the "authority" to make certain tactical decisions during a criminal trial, the defendant certainly retains the ultimate authority to make fundamental decisions regarding his case, including whether to testify in his own behalf. (See <u>United State v. Moody</u>, 977 F.2d 1425, at 1430 (11th Cir. 1992); <u>Brooks v. Ten-</u>

42.

nessee, 406 U.S. 605, at 613 (1972); Feguson v. Georgia, 365 U.S. 570, at 596 (1961); United States v. Teague, 953 F.2d 1525 (11th Cir. 1992); Lema v. United States, 987 F.2d 48, at pp. 52-53 (1st Cir. 1993) "[T]he constitutional right to testify in one's defense is fundamental, and, as such, may not be waived by counsel on the defendant's behalf, regardless of the soundness of any strategic or tactical considerations . . .").)

Petitioner informed counsel that he wanted to testify to the fear he had of "others" and "gang-bangers" and that he "shot the gun only to scare" two of the "rioters" away from his car. There is no question in anyone's mind that petitioner and his cousin did not go to that business area for the purpose of shooting a twelve year old boy as he got off the RTD bus, nor to shoot anyone else. When petitioner was confronted by the two men at his car, he could have very easily have shot them both due to the very close range, though he elected to shoot to one side as a deliberate move to scare the two men away from the car. It was petitioner's decision that the jury "ought to hear something from me because they know I was the one who did it." But defense counsel wasn't having it, and told petitioner as much when he denied him the right to testify on his own behalf. (Sixth Amendment to the United States Constitution).

For the reasons disclosed above, petitioner should have been permitted to testify on his own behalf, and this claim should warrant an evidentiary hearing finding of fact by this court. Remand is appropriate remedy of law.

//

//

43.

## ARGUMENT

## VII.

### THE TRIAL COURT  ERRED WHEN IT REFUSED TO GIVE THE JURY CALJIC 5.10, 5.16, AND 5.43 WHICH WAS IN LINE WITH THE DEFENSE THEORY OF THE CASE

Although the defense has a right to present a defense in line with its theory of the case, based on witness accounts, the evidence and  of the circumstances which are recognized, the trial court has the author- ity to demand both relevancy and materiality to establish what jury in- structions  will be allowed, if any, based on the postures  of the case and evidence.  In other words, the defense is entitled to have the jury instructed on the law that applies to defense evidence.

The  defense requested that CALJIC 5.10, 5.16 and 5.43 should have each  been  applicable because they were based on the theory of the de- fense evidence and at least "some basis," other than an unexplained re- jection of prosecution evidence, to justify a jury finding on any rela- ted charge; that the evidence supporting any related charge is relevant to  and  admitted for the purpose of establishing whether the defendant is  guilty  of the  charged offense; and that the defense theory is far more  convincing, at least consistent with, a conviction of the related lesser included offense.

CALJIC Nos.  5.10, 5.16 and 5.43 should not have been refused, and the  trial  court committed clear error when doing so.  Reversal of the entire judgment is warranted.

//

//

//

//

**44.**

## ARGUMENT

### VIII.

### A "TOLEDO" DEPARTURE  IS PRESENT IN THIS CASE AND THERE WAS NO JUST CAUSE TO BOUND THIS CASE OVER TO THE SUPERIOR COURT

On August 3,  1995, the Honorable Judge Phillip J. Argento had re-viewed  petitioner's  995  motion.   A decision was rendered almost nine months after the time petitioner filed the motion.  The finding of  the preliminary  hearing  determined  that there was sufficient evidence to bound him over to the Superior Court and rejecting the 995 motion.

In specific terms, the court incorrectly ruled that there were  no rocks  or  bricks found at or around the parking space where petitioner had  fired  the  gun.  Certainly the evidence was readily available, at least  enough  for the prosecution to have clarified for the court that a crime sweep for evidence was conducted, and that the police had found a "softball size rock" next to where petitioner had parked and that the inspection  of  petitioner's  car  discovered that the exterior vehicle mirror  was  broken  in a downward smashed fashion and there were large dents in the left-front portion of the vehicle. The police examined the area  and  to such a thorough extent that they also took photographs of the evidence that was found and examined at the crime scene.

As  was  presented within the foregoing statement of this case and argued  within the claims, supra, the circumstances of which petitioner had  been  subjected to  and which he acted against are claimed to have been  at  no  fault  of his own, and certainly without malice enough to justify being bound over to the Superior Court on second degree murder.

1. Introduction:

At the preliminary hearing the defense argued that the prosecution

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY
CV - 69 (5/98)

was bound by petitioner's extrajudicial statements they introduced since there was no competent and substantial evidence to the contrary. (See <u>People v. Toledo</u> (1948) 85 Cal.App.2d 577). In accordance with the <u>Toledo</u> doctrine, it was maintained that the evidence showed that petitioner acted in self-defense, i.e. with an honest and reasonable belief that he was in imminent danger of death or great bodily harm for not only himself, but for his cousin Steven, as well. Alternatively, it was asserted that petitioner's conduct was grossly negligent, not malicious, thereby reducing the charge to involuntary manslaughter. Finally, it was argued that petitioner had acted with an honest but unreasonable belief that he was in imminent danger of death or great bodily harm, which would reduce the charge to voluntary manslaughter.

Judge Phillip J. Argento (hereinafter "magistrate judge") reviewed the application of this <u>Toledo</u> claim to the preliminary hearing in this instant case. He rejected the "competent and substantial evidence" standard and applied a "rational ground" standard instead. (Preliminary Hearing Opinion (hereinafter "PHO") at RT p. 4). Nevertheless, the the court held that there was "substantial" evidence to rebut defense theories of self-defense and involuntary manslaughter. (PHO pp. 7, 10). However, the magistrate conceded that "<u>Toledo</u> literally applied at the preliminary hearing would result in reducing the murder to a manslaughter charge." (PHO p. 10-11).

Since the preliminary hearing court was without any legal authority to reformulate the <u>Toledo</u> doctrine, the "competent and substantial evidence" standard should have been applied. When the "competent and substantial evidence" standard is applied, the magistrate conceded that the murder charge must be reduced to voluntary manslaughter. (PHO p.

46.

10-11).

### A. Under The Toledo Doctrine, The Prosecution Is Bound By The Extrajudicial Statements Of The Defendant They Introduce Unless There Is Competent And Substantial Evidence Incompatible With The Theory Of Excuse Or Mitigation:

In the multitude of cases that have applied the Toledo doctrine since its inception, never has there been any standard utilized other than "competent and substantial evidence." Nevertheless, the magistrate asserts his own "rational ground" standard to replace the traditional Toledo document. (PHO p. 10).

The court contends that Proposition 115 somehow reduced the burden of proof requirement to hold a defendant to answer a preliminary hearing. (PHO pp. 4, 12-13). The court asserted that the "traditional" standard of "probable cause" or "sufficient cause" denotes "a state of facts that would lead a person of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused." (PHO pp. 12-13; see Penal Code sections 866(b), 872; see People v. Slaughter (1984) 35 Cal.3d 629, at 636; People v. Acosta (1995) 45 Cal.Rptr. 538, at 542, 290 P.2d 1, at 4; and People v. Ross (1979) 92 Cal.App.3d 391, at 400, 154 Cal.Rptr. 783, at 786).

The court suggested that the traditional standard has been superseded by a lesser standard that merely requires "some rational ground." (PHO p. 13; People v. Salaughter, supra, 35 Cal.3d at p. 637; People v. Orin (1975) 13 Cal.3d 937, at 947). The magistrate claims that the traditional Toledo doctrine is inconsistent with the reduced burden of proof and the efficient administration of the criminal justice system. (PHO p. 15).

While the court's opinion contains interesting public policy con-

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY
CV - 69 (5/98)

siderations, it is utterly devoid of case law to support its position. There is simply no legal authority that suggests a diminished <u>Toledo</u> doctrine, before or even after Proposition 115.

Moreover, the logical underpinnings of the court's argument are fallacious. Proposition 115 actually uses the words "probable cause" in the text of Penal Code section 866(b) which reflects the traditional standard, and not a reduced burden of proof. Penal Code section 866(b) states as follows: "It is the purpose of the preliminary examination to establish whether there exists <u>probable cause</u> to believe that this defendant has committed a felony." (Emphasis added). Subsequent to the passage of Proposition 115, the California Supreme Court has reaffirmed that the traditional probable cause standard applies at the preliminary hearing and at grand jury proceedings. (<u>Commiskey v. Superior Court</u> (1992) 3 Cal.4th 1018, at pp. 1026-1029). In <u>People v. Childs</u> the Court of Appeal treated the "probable cause" standard and the "rational basis" standard as equivalent; both constituting such a state of facts as would lead a man of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused." (<u>People v. Childs</u>, <u>supra</u>, (1991) 226 Cal.App.3d 1397, at 1407; see also <u>People v. Uhlemann</u> (1973) 9 Cal.3d 662, at 667). Since there is no reduced burden of proof at the preliminary hearing, the magistrate's rationale for positing a diminished <u>Toledo</u> doctrine is not substantiated.

    B. <u>When The Toledo Doctrine Is Applied To The Present Case, The Evidence At The Preliminary Hearing Is Insufficient To Hold Petitioner To Answer To The Charge of Murder</u>:

In its opinion, the court stated that the "official" result of the preliminary hearing was as follows:

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY
CV - 69 (5/98)

"In summary, <u>Toledo</u> literally applied at preliminary hear-
ing  would result here in reducing the murder to a manslaughter
charge . . . If  <u>Toledo</u>  does call for application of the subs-
tantial evidence test without accommodation to <u>Slaughter</u>, <u>Whit-
man</u>,  <u>Bolden</u>, and 115, etc., then this opinion makes clear that
in this magistrate's view substantial evidence is lacking on
the issue of actual belief."  (PHO pp. 10-11).

A  large  group  of  gang members were assaulting two persons in a
car about 10 to 14 feet from where petitioner was.

C. <u>The Toledo Doctrine Applies At The Preliminary Hearing</u>:

The magistrate  acknowledged  that  the <u>Toledo</u> doctrine applied at

the  preliminary  hearing,  notwithstanding his personal preferences to

the  contray.  (PHO pp.  4, 11).  The applicability of the <u>Toledo</u> doct-

rine  at  the preliminary hearing has never been challenged or rejected

by the courts.

In <u>People v. Matthews</u> the court of Appeal upheld the applicability

of the <u>Toledo</u> doctrine at the preliminary hearing. (<u>People v. Matthews</u>,

<u>supra</u>, (1988) 201, Cal.App.3d 385, PHO at p. 4).  In his writ of prohi-

bition to restrain the Superior Court from allowig him to be prosecuted

for murder, the defendant argued that the prosecution was bound by  his

extrajudicial statement regarding the death of the victim and could not

introduce other  acts  evidence  that he had committed two prior rapes.

(<u>People v. Matthews</u>, 201 Cal.App.3d at p. 393).

In its analysis, the court applied the <u>Toledo</u> doctrine, however it

found that there was other "competent and substantial" evidence to est-

ablish guilt.  The "modern rule" permits impeachment of the defendant's

extrajudicial  statement  by  the  prosecution,  even when they are the

party  to  introduce  that  statement into evidence.  (<u>Id.</u>, at p. 394).

Therefore,  the  other-acts-evidence of the prior rapes were admissible

under  Evidence  Code  section  1101(b)  to establish a common plan and

49.

scheme. (Ibid.) This evidence constituted "competent and substantial" evidence to establish guilt and thus the prosecution was not bound by the defendant's extrajudicial statement. The applicability of the To-ledo doctrine at the preliminary hearing is presupposed in the analysis and holding of the Matthews court.

For the reasons discussed above, petitioner should never have been bound over from the preliminary hearing to the Superior Court, arraign-ment on the charge of murder based on the poignant and succinct circum-stances of this case. Remand is astronomically warranted.

<u>ARGUMENT</u>

IX.

<u>THE CUMULATIVE EFFECT OF THE ERRORS REQUIRES REVERSAL OF THE JUDGMENT</u>

Even where individual errors do not result in prejudice, the cumu-lative effects of such errors may require reversal. (<u>Mac v. Blodgett</u>, 970 F.2d 614, at 622 (9th Cir. 1992)[cumulative prejudice requires affirmance of order granting petition for writ of habeas corpus]; <u>Lin-coln v. Sunn</u>, 807 F.2d 805, at 814, fn. 6 [cumulative errors may result in unfair trial in violation of due process]; accord <u>United States v. v. McLister</u>, 608 F.2d 785, at 788 (9th Cir. 1979); see also <u>People v. Hill</u> (1998) 17 Cal.4th 800, at 845-847 [cumulative effect of multiple errors resulted in miscarriage of justice, requiring reversal under the California Constitution].) In cases which involve multiple trial errors it is important for the reviewing Court to consider the cumulative pre-judice "and not simply conduct [] a blankanized issue-by-issue harmless error review." (<u>Thomas v. Hubbard</u>, 237 F.3d 1164, *35 (9th Cir. 2001) [citations and internal quotation marks omitted; the LEXIS version of

50.

this case does not contain official page citations].)

Here, the cumulative effect of the many substantial errors raised on the direct appeal and moreover on this instant habeas corpus petition requires reversal under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065 (1967).

First, the substantial evidence in the record as a whole contains spurious representation of counsel that was overwhelmingly ineffective in providing the assistance which petitioner needed in this particular case, and it was just that sort of "counsel" which resulted in the requisite quantum and quality of the evidence which had virtually gone unnoticed by attorney Stanwier to such a degree that he lost sight of the forest due to the trees which was all that was necessary to sustain the conviction on direct appeal.

But counsel's gross ineffective assistance was not all that was wrong with this petitioner's trial. Petitioner was not permitted to testify, the jury did not receive the required fair-play CALJIC instructions which would have substantially evened the playing field on the issue of manslaughter v. murder one or two. The jury instructions also contributed to the overall unfairness of the trial is only tantamount to the fact that the jury did not consider the proper evidence and fact findings in this case with which to have been sufficiently armed with some leeway to decide the case for just what it was.

Absent all of the trial errors here, a reasonable juror could well have believed that petitioner was not a person with malice intent to have deliberately shot another human being and that the incident was a product of societies choices in just how community citizens are responding to everyday-frequent gang-activities in our neighborhood and

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

business areas. When reviewing this case we must remind ourselves to be conscientious to ourselves, if no one else, and opine just what any one of us would do, could do, if caught up in the circumstances which were present in this case. Sort of classic to the saying "Damned if you do, and damned if you don't" . . . and a 12 year old boy is fatally shot eighty yards away. . . is just what needs to be pondered here.

Thus, even if no single error was prejudicial, the cumulative prejudice requires reversal of petitioner's conviction. No amount of pointing to some other evidence can cloud the fact that petitioner could not have had a fair trial because of these many trial-wrongs.

* * * * * *

## CONCLUSION

For the foregoing reasons, petitioner prays that this Court will issue an order to show cause why his conviction and sentence should not be set aside.

I, the undersigned petitioner/declarant, declare under the penalty of perjury and the laws of the State of California, that the claims and facts presented here are true and correct to the best of my knowledge, information and belief, except as to such matters based only on information and even as to such averred upon belief, I certainly do believe same to be critically true and correct. This document may be deemed as a notarized statement, though not normally required by the Court where there are no services available or affordable to an incarcerated person pursuant to Title 28 U.S.C. section 1746 and CCP section 2015.5, the above statement may be substituted for notarization in most cases where

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY
CV - 69 (5/98)

it may be required.  PETITIONER FURTHER SAYETH NAUGHT, this____ day of January, 2008, at San Diego, California.

                            Respectfully submitted,


DATED: January _12_, 2008     _____
                              Mr. ERROL D. SMITH, Petitioner

                              In Propria Persona

                              California Penal Code Section 1258


Exhibits Attached

Proof of Service By Mail Attached


                            53.

Wherefore, Petitioner prays that the Court grant Petitioner relief to which he may be entitled in this proceeding.

_____

SIGNATURE OF ATTORNEY (IF ANY)

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

_____1-12-2008_____          _____

(DATE)                                         SIGNATURE OF PETITIONER

CIV 68 (Rev. Jan. 2006)                                  -12-                                                cv

Exhibit A: Court of Appeal, 2d.App.Div.Two Opinion, Dated July 23, 1998
12 pages;

# EXHIBIT   A

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B114703 |
| Plaintiff and Respondent, | (Super. Ct. No. GA 023494) |
| v. | **COURT OF APPEAL · SECOND DIST.** |
| | **F I L E D** |
| ERROL SMITH, | JUL 2 3 1998 |
| Defendant and Appellant. | JOSEPH A. LANE              Clerk |
| | B. L. VILLANUEVA       Deputy Clerk |

Twelve-year-old Justin Richard was shot to death on his way home from school. He died of a single gunshot wound to the head. Following a jury trial, appellant Errol Smith was convicted of second degree murder and was sentenced to the low term of 15 years plus four years for the personal use of a firearm.[1] Appellant admits he fired the shot that killed Justin, but contends the evidence is insufficient to demonstrate malice and that he shot in a genuine though unreasonable belief he was in imminent danger of death or great bodily harm from gang members and inadvertently killed the victim. He asks that the judgment either be reversed or be reduced to manslaughter. The sole issue on appeal

---

[1]     Appellant was initially charged with first degree murder. The trial court granted a motion pursuant to Penal Code section 1118.1 eliminating first degree murder from the jury's consideration. The court characterized the scene as a "mini riot." The People struck an allegation that the killing was done as a result of discharging a firearm from a motor vehicle in violation of Penal Code section 12022.5.

is whether substantial evidence supports the judgment. Holding that substantial evidence supports the judgment, we shall affirm.

## STATEMENT OF FACTS

### *Motion to suppress evidence*

At the 1538.5 hearing, while defendant was still acting in pro per, Deputy Sheriff Pitts testified he was investigating defendant on the morning of March 21, 1995, for involvement in burglaries.[2] Many officers were in undercover vehicles and in plain clothes. Pitts knew defendant was going to be driving a goldish brown 1981 Honda station wagon with a certain license plate. The team followed defendant from his residence throughout the morning. At about 3 p.m., Pitts saw defendant enter his Honda at his home in the Meadows section of Altadena and followed him to the intersection of Altadena and Lincoln. There was a male passenger in the car.

Defendant went into a drive-in liquor store on the southwest corner of the intersection and then left the liquor store parking lot. Pitts was informed that about 3:20 p.m. there was a shooting in that area and the victim was a 12-year-old child, who was shot at the corner of George's Liquor Store, right by the front door. Another patrol officer told Pitts that some time after the shooting, defendant was no longer in that area.[3] Detective Ploch told Pitts he had located a witness who saw a male Black in a brown car who was responsible for the shooting; the witness saw the suspect shooting from a

---

[2]     This information was not before the jury, which was informed only that the sheriffs were conducting an investigation in that area in an undercover vehicle and at that point their attention focused on defendant.

[3]     That deputy testified that she observed defendant pull into the parking lot, backing in, and that the shots occurred about three to four minutes later. No other occupants were in defendant's vehicle, nor (other than a car being vandalized) were there any other cars in the parking slots in that parking lot at the time. The vandalism was confined to an "immediate area." About four or five people were vandalizing that car, throwing rocks and taunting the occupants. She did not see the defendant shoot.

2

location in the parking lot. Pitts had information that defendant was parked in that location and no other vehicle was parked near his Honda at approximately the time of the shooting.

Later that day, Pitts and others located defendant and took him into custody as a possible witness and a probable suspect.[4]

On cross-examination, Pitts testified that he witnessed some people approach defendant's vehicle but did not witness an assault. He has seen photographs showing rocks at the location.

Another deputy gave defendant his *Miranda* rights. Defendant admitted to shooting four times and took the deputy to the gun, which was found in the attic of a house to which defendant directed the officers.

In defense, defendant called Deputy Charles Robinson and Detective Patrick Tapia. Deputy Robinson saw defendant driving with a passenger at Altadena and Lincoln. A male walked toward defendant and had a short conversation with him. Robinson did not see defendant shooting. About two hours later, as defendant drove off from a residence, Robinson called defendant's vehicle out to the rest of the surveillance team.

Detective Tapia of the NORSAT team was also watching defendant that day. He viewed defendant drive into the driveway at the liquor store and talk for a few seconds with some people standing there. A bus then briefly blocked the detective's view; when the bus moved, defendant's car was parked in one of the stalls. He saw defendant walk out of the liquor store, start walking to his car and talking with "some guy," get into his car and start to back up. He saw defendant leaning out the driver's side and motioning "like this come here." There was no passenger in defendant's car when he left the liquor

_____

[4]    The report written by Pitts mentioned defendant was a witness and did not refer to him as a suspect.

store. Tapia heard about the shooting on the police radio but did not witness it. He had driven away looking for defendant's car. About 20 to 50 minutes after the shots, a radio call went out to find defendant and his car. Tapia saw the arrest and search of defendant's car.

The trial court found sufficient probable cause for the arrest. After the 1538.5 motion, defendant asked for counsel, and his advisory counsel was appointed as his attorney.

### The trial

On March 21, 1995, near the intersection of Lincoln and Altadena, some teenagers dressed in "gangbanger" clothes were throwing bricks at and jumping on a gray car in a parking lot area near a flower store. A girl and a grown man were inside the car, which was surrounded by the teenagers. The windshield of the car was smashed. The man got out of the car with a bat to try to drive them back. No other cars were then in the lot.

Akisha Rosses, the woman in the car, was then about twenty-one years old. She was with Thomas Wayne, an ex-boyfriend, and was driving her 1981 Honda Civic. Stopped at a stop sign at the intersection of Lincoln and Altadena, she was approached by a group of Crips from George's Liquor parking lot and they threw a rock at her car. She recognized one of the guys, Keithie, who had been at her house several times and was a member of the Crips gang. The rock thrown by Keithie hit the back of her car. She then made a U-turn, but some guys got in front of the car so she stopped. At trial, she denied being frightened or angry.

Keithie then called her a "slob bitch," a name the Crips call rival gang Bloods. (Ms. Rosses denied being a Crip or a Blood.) Someone then swung their arm into the car and hit her passenger. At this point, she was stopped in the middle of the street, in the middle of the intersection. Her passenger then got out and chased two of them back.

Rosses then pulled over into the parking lot and parked in a space. Her passenger was up at the market with the guys he was chasing. Then Keithie and another guy started

kicking her car and jumping on top of it. Keithie jumped through the windshield and shattered it; Rosses was then outside the car and testified she did not feel personally threatened, stating they were laughing and "were just having fun acting stupid" at her expense.

Some other guys were driving down the street, jumped out, and were approaching her, saying "This is Altadena," meaning the Altadena Block Crips. One brick was thrown at her car and hit her in the back. They were aiming at her car, not at her, and jumped on the hood of the car after hitting her with the brick. Rosses got a stick from her trunk to hit them. Her passenger said to leave, and she did so without hitting anyone. No one blocked her from leaving. As she pulled out, the young men were going different ways and three, including Keithie, were walking across the street to George's Liquor Store. Some of them got into a car and left. She felt out of harm's way and had no problem leaving. Having left the intersection on her way home, she heard gunshots. She drove home and then to McDonald's to tell them that her boyfriend, who had been hurt, could not go to work that night. On her way back from McDonald's, she passed the location and stopped to talk to the police, but they would not pay attention to what she had to say; she pointed out somebody leaving in a brown car as one of the Altadena Crips that had attacked her and then she left. The police picked her up about ten minutes later and interviewed her.[5]

Although testifying at trial that she was not afraid while the people were vandalizing her car, Rosses admitted saying previously that it was similar to a "riot fight." The area immediately around her was violent, but the entire area was not. The attackers put $600 worth of dents in her car.

---

[5]     She believes there were several mistakes in the police report and the report by the defense investigator who interviewed her. The report painted a picture of a far more dangerous situation, with Rosses fearful that the Crips were shooting at her. The deputy sheriff who interviewed her testified as to her report at the time.

While the gangbangers were attacking Rosses' vehicle, the victim and his twin brother, Jared Richard, neither of whom were gang members, were taking the RTD bus home from school that afternoon. Reaching the intersection of Lincoln and Altadena, the bus stopped at a different location than usual. The twins and other school children got off the bus. Jared and his brother were going to baseball practice.

Jared heard gunshots and ducked; he saw his brother lying down. When the gunfire ended, his brother had a gunshot wound in the middle of his forehead.[6] Blood was trailing from the vicitm's head, his eyes were moving, but he did not respond to Jared. Jared was crying, and a nun from a nearby church came to help him. The paramedics arrived and put his brother into the ambulance. Jared saw his brother at Huntington Hospital and heard he had passed away.

A parks supervisor was parked in the parking lot with her daughter when she saw about five or six teenagers taunting and teasing the couple in a car and throwing a couple of rocks.[7] It appeared they were the only ones being taunted. There was some profanity, just to aggravate the couple; when the boyfriend would charge at them, they were laughing. Other spectators were watching as well with attention focused on the northeast parking lot. She thought she recognized some of the teenagers and was going to over and say something; her daughter started crying and told her not to, fearing her mother would get hurt. After the couple backed out and were in the street, she heard some gunshots, which sound as if they were coming from the parking lot. She got scared and grabbed her

---

[6]    The deputy medical examiner testified that the path of the bullet was straight forward through his brain and was the cause of death. That bullet and a projectile found at the scene positively were fired from the gun found in the attic to which defendant led the deputies. Tests on the shell casings found at the scene were inconclusive; they could have been fired in this pistol, but the expert was not as certain as with the projectiles.

[7]    She did not see anyone jumping on or kicking the car, though three might have done so. Neither did she see the young woman go to the back of the car. She recalls seeing things being thrown back and forth and the boyfriend running at the guys.

daughter to get her in the car. No one from the group involved in attacking the Honda came over to her parking lot. She then saw the victim, whom she knew from the parks program, laying in front of George's Liquor.

At about 3:15, Deputy Sheriff Tapia, in plain clothes and an unmarked vehicle, saw defendant with a passenger pull his brownish station wagon into the driveway at George's Liquor Store. Some other people were in the lot but did not appear to be approaching defendant, who then parked. An RTD bus then obstructed the deputy's view, but Tapia later saw defendant get back into his car and back out of the stall, without a passenger. Before slowly entering the roadway, defendant stopped in the driveway area, leaned out of the driver's side window and looked back at some guys standing by the liquor store. Defendant and these people, whom Tapia did not believe were wearing gang clothing, had a conversation but were laughing and joking, not shouting at each other. No one was trying to get into defendant's car. Rather, defendant motioned to the person he had been talking to with a "come here" motion, and the person approached defendant. Joined by a second person, neither threw anything at defendant. They were laughing and joking around, and then defendant drove away. The other two guys just turned around and walked back to the liquor store; they did not chase defendant.

Tapia left the intersection and did not hear any gunshots. Neither did he see rocks and bricks being thrown. About ten minutes later, he heard there had been gunshots. That evening, he was present when defendant was taken into custody.

Nona Hatamian was driving down Altadena Drive in a convertible when she approached Lincoln. She saw about ten to 15 kids throwing bottles, bricks and stones at a bluish-silver car that was moving towards her very slowly. "Further up the street" she saw a brownish Honda and a young Black man, at least six feet tall, standing outside the car with his armed braced with a gun.[8] She had an unobstructed view of the man, who

---

[8]    She remembers the car because her girlfriend has "almost the twin to that car."

7

appeared to be aiming, with hands outstretched in the direction of the attacked car.[9]  No one was near him; there were no rocks going over in his direction.  Rather, the attack seemed to be directed at the people in the bluish car.  People were jumping on the car and banging it with their fists or rocks.  Some backed off as the car started into the intersection.  She was "pretty anxious" and then heard a gunshot and drove through the intersection as fast as she could.  Her recollection of the position of the attacked vehicle is different from that of Ms. Rosses.  Nor did she think the suspect was parked in a parking stall.  She heard at least one other gunshot.  After driving her girlfriend home, she returned to the scene to look for an officer, feeling it was her duty to do so.

That evening, an investigating officer found four shell casings from a 380 caliber semiautomatic pistol and pebbles and one rock in the parking lot area near the casings.[10] He found no bricks or broken bottles.  He introduced himself to defendant at the station. Defendant made the spontaneous statement "I really got myself into some trouble this time" and then hesitated for a few seconds and asked if self-defense could be an issue.

The officer then advised defendant of his *Miranda* rights, which defendant understood and waived.  After defendant started talking about pulling into George's Liquor Store, the officer asked if he could tape the conversation; defendant acquiesced. The officer then readvised defendant of his rights and recorded their conversation. Defendant was cooperative.

In the taped conversation, defendant admitted carrying the loaded gun in his car, stating it was for self-protection.  According to defendant, the teenagers thumped his car and banged his window.  He felt threatened by the Crips, who he said tried to get in his

---

[9]    According to Ms. Hatamian, the police report erred in stating that she said the suspect was leaning out the window, as if he was in the car.  In fact, he was standing outside the car and leaning on the outside of the window.  His hands were braced on the window.

[10]    Another projectile was recovered on March 24 from the door of a vehicle that had been parked at George's Liquor Store the night of the incident.

car, and thought they wanted to take his car. He also admitted the shooting but stated his intention was to scare, not hit, anyone. He got "fed up" and decided to shoot.

Defendant agreed to take the officer to a location where he had put the gun that afternoon. The officers were given permission to enter the house and found the gun in the attic area, which was reached from a door on the ceiling in the hallway. The gun, a Davis 380, was loaded and cocked. There was a magazine with one round in it.

### *Defense*

Deputy Ploch was called by the defense regarding the report he took on March 21, 1995, from witness Hatamian. She approached him and they talked for about three minutes; he did not take notes and later he wrote the report upon return to the station. According to the Deputy, she told him that the suspect was inside his vehicle when he fired twice leaning out the driver's side window and that she could not tell how tall he was.

Following trial, defendant again requested to represent himself and that request was granted. The court denied defendant's motion to reduce the verdict from second degree murder and denied defendant's motion for new trial.

### DISCUSSION

*Substantial evidence supports the judgment.*

As appellant recognizes, the standard for review is whether substantial evidence supports the judgment. "The test on appeal for determining if substantial evidence supports a conviction is whether "'a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt.'" (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [].) In making this determination, we "'must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (*Ibid.*)" (*People* v. *Rayford* (1994) 9 Cal.4th 1, 23.)

Second degree murder, unlike manslaughter, requires a finding of malice aforethought, which appellant claims is missing in the case at bench. "Second degree murder is defined as the unlawful killing of a human being *with malice aforethought*, but without the additional elements--i.e., willfulness, premeditation, and deliberation--that would support a conviction of first degree murder. (§§ 187, subd. (a), 189; [citations].) In contrast, manslaughter is the unlawful killing of a human being *without malice.* (§ 192; [citations].) [¶] Malice, for the purpose of defining murder, may be express or implied. (§ 188.) It is express 'when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.' (§ 188; [citation].) Implied malice is present 'when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.' (§ 188; [citation].) Thus, the mental state comprising malice is independent of that encompassed within the concepts of willfulness, deliberation, and premeditation. (See §§ 187- 189; [citations].) Ill will toward, or hatred of, the victim are not prerequisites of malice as that term is used in the statutory definition of murder. [Citations.] When it is established that the killing was the result of an intentional act committed with express or implied malice, no other mental state need be shown in order to establish malice aforethought. (§ 188.)" (*People* v. *Nieto Benitez* (1992) 4 Cal.4th 91, 102-103.)

Courts have discussed the concept of implied malice in the context of second degree murder, at issue in the case at bench: "We have said that second degree murder based on implied malice has been committed when a person does '"' an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life'" . . . .' [Citations.] Phrased in a different way, malice may be implied when defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life.

10

(*People* v. *Washington* (1965) 62 Cal.2d 777, 782 [].)" (*People* v. *Watson* (1981) 30 Cal.3d 290, 300)

The jury in the case at bench was instructed the "Malice is implied when:

"1. The killing resulted from an intentional act;

"2. The natural consequences of the act are dangerous to human life; and

"3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for human life."

The jury could easily find implied malice, the theory relied upon by the People, from the facts before it. Defendant was at an intersection crowded with school children and chose to fire four shots directly toward a crowd of people.

Appellant contends that he had a genuine but unreasonably held belief in his need to defend himself, which if true would negate any malice and reduce the offense to manslaughter. (*People* v. *Ceja* (1994) 26 Cal.App.4th 78, 86; see also *In re Christian S.* (1994) 7 Cal.4th 768, 783.) The jury was instructed in terms of all the possible defenses on which appellant now relies, including imperfect self-defense. (Compare *People* v. *Ceja, supra,* 26 Cal.App.4th 78, 88, [judgment reversed for failure to give instruction on imperfect self-defense.]) The jury in the case at bench could have believed defendant's version of the facts, which would have led to a verdict of manslaughter or not guilty, but was not bound to do so.

However, the jury was not compelled to believe defendant and, as the trial court stated at sentencing, did not buy defendant's argument. The jury was also instructed that "Testimony by one witness which you believe concerning any fact is sufficient for the proof of that fact." Defendant was 50 or 60 feet away from the attack on the Rosses vehicle, which even the prosecutor characterized as a "riotous type situation." The gangbangers were not attacking defendant, who witnesses say was alone in his portion of the parking lot. According to the deputy who had observed his conversations with those present, they seemed friendly and joking, not threatening. Nevertheless, defendant braced

his outstretched arms to shoot into the crowd, at a low enough level to hit a child in the head. As trier of fact, the jury's verdict of second degree murder is supported by substantial evidence.

## DISPOSITION

The judgment is affirmed.

***NOT TO BE PUBLISHED.***

ZEBROWSKI, J.

We concur:

BOREN. P.J.

NOTT, J.

12

Exhibit B: Reporter's Transcript pp. 783 and 799, total 2 pages;

# EXHIBIT    B

1   THE DEFENDANT: NO.

2   THE COURT: FORMER LAWYER.  HOW LONG DO YOU EXPECT

3   THIS EXAMINATION TO LAST?

4   THE DEFENDANT: WELL, I THINK A DECLARATION WOULD BE

5   SUFFICIENT.

6   THE COURT: THE FORTUNATE THING IS I AM PREPARED TO

7   HEAR YOUR MOTION TODAY.  ALL RIGHT.  WHY DON'T WE HAVE YOUR

8   WITNESS COME.  OTHERWISE WE ARE GOING TO DELAY THE

9   PROCEEDINGS.

10              DO YOU WANT YOUR WITNESS SWORN?

11   THE DEFENDANT: YES.

12   THE CLERK:  YOU DO SOLEMNLY SWEAR THAT THE TESTIMONY

13   YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT

14   SHALL BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE

15   TRUTH, SO HELP YOU GOD.

16   THE WITNESS: I DO.

17

18              RICKARD SANTWIER,

19      CALLED AS A WITNESS BY AND ON BEHALF OF THE

20      DEFENSE WAS EXAMINED AND TESTIFIED AS FOLLOWS:

21

22   THE CLERK:  PLEASE TAKE A SEAT ON THE WITNESS STAND.

23   WOULD YOU YOU PLEASE STATE YOUR NAME FOR THE RECORD?

24   THE WITNESS: RICKARD SANTWIER, R-I-C-K-A-R-D,

25   S-A-N-T-W-I-E-R.

26   THE CLERK: THANK YOU.

27   THE COURT: YOU MAY PROCEED.

28   THE DEFENDANT: I WANT TO MAKE YOU YOU AWARE THAT I

1    Q    THAT WAS ONE OF THE WITNESSES?

2    A    MR. SMITH, TO BE HONEST WITH YOU, I HAVE NOT

3  LOOKED AT THIS FILE IN SOME TIME.

4         I RECEIVED IN THE MAIL THIS WEEK,

5  APPROXIMATELY TWO OR THREE DAYS AGO, THE SUBPOENA. I HAD

6  NO IDEA WHAT I WAS SUBPOENAED FOR.

7    Q    OKAY. WELL, I WANTED TO MAKE AWARE THAT THERE

8  WERE DEFENSE WITNESSES.

9    A    TRUE. THERE WERE A NUMBER OF NAMES THAT YOU

10 GAVE ME OF PEOPLE THAT WERE POTENTIAL WITH DEFENSE

11 WITNESSES.

12   Q    OKAY, AND THERE WERE WITNESSES THAT YOU, IN

13 FACT, HAD INTENDED TO CALL, I WOULD IMAGINE SINCE YOU DID

14 GIVE THE PROSECUTOR A COPY OF DEFENSE WITNESSES TO BE

15 CALLED, AND WERE THERE ANY DEFENSE WITNESSES CALLED?  NOT

16 PROSECUTION WITNESSES, BUT DEFENSE WITNESSES?

17   A    I THINK THE RECORD SPEAKS FOR ITSELF, MR.

18 SMITH, AS TO WHO WAS CALLED AND WHO WASN'T CALLED.

19   Q    OKAY, I UNDERSTAND THAT. I AM ASKING YOU THIS

20 QUESTION.

21   A    TO BE HONEST WITH YOU, I DON'T REMEMBER THAT

22 SPECIFIC PART OF THE TRIAL WITHOUT SITTING DOWN AND

23 REVIEWING EITHER MY NOTES OR THE COURT FILE.

24        AS I TOLD YOU, THE TRIAL WAS SOME TIME AGO.

25   Q    DO YOU REMEMBER WHO YOU CALLED?

26   A    I DO NOT. I DO NOT.

27        THE DEFENDANT: ALL RIGHT.

28        THE COURT: ANYTHING ELSE?

Exhibit C: Clerk's Transcript pp. 331-336, and Reporter's Transcript p.
795, total 3 pages;

# EXHIBIT   C

*denied w/out prejudice 10/3/96*

000331

1  SUPERIOR COURT OF THE STATE OF
2  CALIFORNIA FOR THE COUNTY OF LOS ANGELES
3
4  PEOPLE OF THE STATE            NO GA023494
5  OF CALIFORNIA                  NOTICE OF
6           PLAINTIFF             SUPPLEMENTAL
7                                 FOR PRETRIAL
8       Vs                        DISCOVERY
9                                 PITCHESS MOTION
10                                DATE: 9/24/96
11                                TIME: 8:30
12      ERROL SMITH               PLACE: PAS
13
14  TO THE DISTRICT ATTORNEY OF GIL GARCETTI
15  COUNTY AND his REPRESENTATIVE AND TO
16  SHERIFF DEPARMENT
17
18  PLEASE TAKE NOTICE THAT ON DATE 9/23/96 AT
19  HOUR OF 8:30AM OR AS SOON THEREAFTER
20  AS THE MATTER MAY BE HEARD IN THE
21  COURTROOM OF DEPARTMENT C OF THE
22  ABOVE-ENTITLED COURT, THE DEFENDANT
23  WILL MOVE FOR AN ORDER OF PRETRIAL
24  DISCOVERY.
25
26  THE MOTION WILL BE MADE ON THE GROUNDS
27  THAT THE PERSONNEL RECORDS OF THESE NAMED
28  OFFICERS CONTAIN EVIDENCE MATERIAL AND

000336

1. ON THE DATE OF MARCH 21,1995 ERROL
2. SMITH WAS ARRESTED BY THE SHERRIFF
3. DEPT. WITHOUT A WARRANT GRANTED BY THE
4. MAGISTRATE. I WAS THEN ILLEGALLY SEARCHED,
5. THREATEND AND ASSAULTED. DURING THIS
6. ENCOUNTER I WAS DEMORALIZED BY THE
7. USE OF RACIAL SLURS UTTERED BY OFFICERS
8. OF THE ABOVE MENTIONED DEPT. AFTER RECEIVIN
9. DOCUMENTS DISCOVERED BY THE DEFENSE, I AM
10. LEAD TO BELIEVE THAT THE SHERIFFS DEPT
11. HAS FALSE FIED REPORT IN STATEMENTS
12. OBTAINED DURING THE COURSE OF THEIR
13. INVESTIGATION. SUCH MISCONDUCT IS
14. ILLEGAL AND UNEXCEPTIBLE.
15.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.
26.
27.
28.

1      MR. LOCKFIELD: OBJECTION, YOUR HONOR.

2      THE COURT: WHY DON'T YOU ATTACH THAT AND WE WILL

3    MARK IT AS AN EXHIBIT AND HAVE IT RECEIVED.

4      THE DEFENDANT: OKAY.

5      THE COURT: MR. SMITH, WE HAVE GOT TO WIND THIS UP.

6      THE DEFENDANT: OKAY.  COULD WE MARK IT AS DEFENSE

7    ONE?

8      THE COURT: ALL RIGHT.

9    BY THE DEFENDANT:

10      Q      SOME OF THE ISSUES I NEED TO BRING TO HIS

11    ATTENTION, AND THAT WAS THAT THE DECLARATION STATED THAT HE

12    HE WAS AWARE OF THAT ON THAT PARTICULAR DATE OF MY ARREST

13    THAT I WAS ILLEGALLY SEARCHED, THREATENED AND ASSAULTED

14    DURING THIS ENCOUNTER, AND WAS DEMORALIZED BY USE OF RACIAL

15    SLURS UTTERED BY THE OFFICERS, AND I WANTED TO ASK, IS

16    THERE ANY REASON, AFTER KNOWING THESE ALLEGATIONS IN

17    REGARDS TO THE PITCHESS MOTION, WHY THERE WASN'T ANY MOTION

18    TO SUPPRESS UNDER CODE 402?

19      A      ACTUALLY THERE WAS A 1538 POINT 5 THAT YOU RAN

20    THAT WAS DENIED THAT HAD TO DO WITH, AMONG OTHER THINGS,

21    YOUR ARREST, THE STATEMENTS YOU MADE, AND THE GUN THAT WAS

22    RECOVERED AS A RESULT OF YOUR STATEMENTS, AND I DON'T

23    BELIEVE THAT DURING THE COURSE OF THE MOTION, WHICH YOU

24    RAN, THAT THOSE AREAS THAT YOU HAVE JUST READ FROM YOUR

25    DECLARATION WERE DISCUSSED.

26      Q      OKAY.  AND SO YOU WERE AWARE OF THE 17 DEFENSE

27    WITNESSES AND THE 12 PROSECUTION WITNESSES THAT I TOLD THE

28    PROSECUTION I WOULD POSSIBLY BE CALLING?  YOU WERE AWARE OF

Exhibit D: District Court Docket Sheets in re 2:00-cv-10363-AHM-AIJ, of
6 pages;

# EXHIBIT    D

194, CLOSED

# U.S. District Court
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
### CIVIL DOCKET FOR CASE #: 2:00-cv-10363-AHM-AIJ

Errol D Smith v. Ernest Roe, et al                    Date Filed: 09/27/2000
Assigned to: Judge A. Howard Matz                     Jury Demand: None
Referred to: Magistrate Judge Ann I. Jones            Nature of Suit: 530 Habeas Corpus
Demand: $0                                            (General)
Cause: 28:2254 Petition for Writ of Habeas Corpus (State)   Jurisdiction: Federal Question

**Petitioner**

**Errol D Smith**                    represented by **Errol D Smith**
                                                    CDC K-62584
                                                    Lancaster State Prison
                                                    44750 60th St West
                                                    Lancaster, CA 93536-7620
                                                    PRO SE

V.

**Respondent**

**People of the State of California**

**Respondent**

**Ernest Roe**                       represented by **Lawrence M Daniels**
                                                    CAAG - Office of Attorney General of
                                                    California
                                                    300 S Spring St, Ste 5000
                                                    Los Angeles, CA 90013-1230
                                                    213-897-2000
                                                    Email: docketinglaawt@doj.ca.gov
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Steven Edward Mercer**
                                                    CAAG - Office of Attorney General of
                                                    California
                                                    300 S Spring St, Ste 5000
                                                    Los Angeles, CA 90013-1230
                                                    213-897-2000
                                                    Email: docketinglaawt@doj.ca.gov
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|

| | | |
|---|---|---|
| 09/27/2000 | 1 | PETITION FOR WRIT OF HABEAS CORPUS by petitioner Errol D Smith in State Custody referred to Magistrate Judge Ann I. Jones . (pc) (Entered: 09/29/2000) |
| 09/27/2000 | 2 | NOTICE OF REFERENCE to Magistrate Judge Ann I. Jones (pc) (Entered: 09/29/2000) |
| 10/06/2000 | 3 | NOTICE OF DISCREPANCY AND ORDER by Magistrate Judge Ann I. Jones: IT IS HEREBY ORD: The Petn for Writ of H/C is NOT to be fld, but instead REJECTED & is ORD to rtn to cnsl (yl) (Entered: 10/10/2000) |
| 10/11/2000 | 4 | REPORT AND RECOMMENDATION issd by Magistrate Judge Ann I. Jones (yl) (Entered: 10/12/2000) |
| 10/11/2000 | 5 | NOTICE OF FILING REPORT AND RECOMMENDATION by Magistrate Judge Ann I. Jones and Lodging of Proposed Judgment and Order (yl) (Entered: 10/12/2000) |
| 10/17/2000 | 6 | ORDER RE TRANSFER PURSUANT TO GENERAL ORDER 224 (Related Case) filed. [ Related Case no.: CV 98-3573 WDK (AIJ)] Transfer of case declined for the reasons set forth on order by Judge William D. Keller , (cc: all counsel) (kc) (Entered: 10/17/2000) |
| 11/17/2000 | 7 | ORDER by Magistrate Judge Ann I. Jones petn filed in CV 00-11563 MMM s/be entered on the docket of CVV 00-10363 AHM as the 1st amd petn (dmjr) (Entered: 11/20/2000) |
| 12/04/2000 | 8 | MINUTES: withdrawing [4-1] R&R as moot by Magistrate Judge Ann I. Jones CR: n/a (dmjr) (Entered: 12/13/2000) |
| 12/04/2000 | 9 | REPORT AND RECOMMENDATION issd by Magistrate Judge Ann I. Jones (dmjr) (Entered: 12/13/2000) |
| 12/06/2000 | 10 | NOTICE OF FILING REPORT AND RECOMMENDATION by Magistrate Judge Ann I. Jones and Lodging of Proposed Judgment and Order (dmjr) (Entered: 12/13/2000) |
| 12/18/2000 | 11 | REQUEST by petitioner for Mag to exhaust issues that were present at CA Sup Crt (dmjr) (Entered: 12/27/2000) |
| 12/18/2000 | 12 | 2nd AMENDED PETITION FOR WRIT OF HABEAS CORPUS [1-1] by petitioner Errol D Smith (dmjr) (Entered: 12/27/2000) |
| 12/20/2000 | 13 | NOTICE OF DISCREPANCY AND ORDER by Magistrate Judge Ann I. Jones req for Mag re exhaustion (cc: all counsel) (dmjr) (Entered: 12/27/2000) |
| 12/26/2000 | 14 | NOTICE OF DISCREPANCY AND ORDER by Magistrate Judge Ann I. Jones ltr ord rejected & retn to cnsl (cc: all counsel) (dmjr) (Entered: 01/02/2001) |
| 01/04/2001 | 15 | ORDER by Magistrate Judge Ann I. Jones req retn to 2nd amd petn (dmjr) (Entered: 01/10/2001) |
| | | |

| 01/04/2001 | 16 | MINUTES: granting motion request [11-1] re filing 2nd amd petn withdrawing [9-1] R&R by Magistrate Judge Ann I. Jones CR: n/a (dmjr) (Entered: 01/10/2001) |
| 01/17/2001 | 17 | MAIL Returned; Ntc of Document Disrepeancy filed 12/26/00 (ks) Modified on 01/22/2001 (Entered: 01/18/2001) |
| 01/23/2001 | 18 | RETURN RECEIPT of Certified Mail showing delivery to CA Atty Gen of ord req retn, petn on 1/16/01 (dmjr) (Entered: 01/29/2001) |
| 02/13/2001 | 19 | NOTICE OF DISCREPANCY AND ORDER by Magistrate Judge Ann I. Jones; IT IS HEREBY ORD The Expansion of Review rcd 2/9/01 is NOT to be fld, but instead REJECTED, & is ORD rtnd to cnsl (dw) (Entered: 02/16/2001) |
| 03/01/2001 | 20 | APPLICATION by petitioner for bail panding determination of h/c petn (dmjr) (Entered: 03/05/2001) |
| 03/05/2001 | 21 | MINUTES: denying motion application [20-1] for bail by Magistrate Judge Ann I. Jones CR: n/a (dmjr) (Entered: 03/06/2001) |
| 03/07/2001 | 22 | NOTICE OF DISCREPANCY AND ORDER by Magistrate Judge Ann I. Jones the cert of probable cause received 3/1/01 is noto be filed, but instead rejected and is ord returned to cnsl. (shb) (Entered: 03/09/2001) |
| 03/08/2001 | 23 | NOTICE OF DISCREPANCY AND ORDER by Magistrate Judge Ann I. Jones mot req reimbursement ord rejected & retn to cnsl (cc: all counsel) (dmjr) (Entered: 03/12/2001) |
| 03/15/2001 | 24 | Notice OF INTERESTED PARTIES filed by respondent Ernest Roe (dmjr) (Entered: 03/16/2001) |
| 03/15/2001 | 25 | APPLICATION by respondent for enlargement of time. Lodged ord (dmjr) (Entered: 03/16/2001) |
| 03/19/2001 | 26 | ORDER by Magistrate Judge Ann I. Jones resp hv to 4/4/01 to file retn to 2nd amd petn, petnr hv to 6/3/01 to file trav (dmjr) (Entered: 03/20/2001) |
| 03/26/2001 | 27 | RESPONSE by petitioner re order [23-1] (dmjr) (Entered: 03/27/2001) |
| 03/26/2001 | 28 | REQUEST by petitioner for ord for access to law library & legal materials (dmjr) (Entered: 03/27/2001) |
| 03/27/2001 | 29 | MINUTES: denying motion request [28-1] by Magistrate Judge Ann I. Jones CR: n/a (dmjr) (Entered: 03/30/2001) |
| 04/03/2001 | 30 | APPLICATION for enlargement of time to & incl 5/4/01 in which to file the rtn to Petitioner's 2nd Amd Petition for Writ of Habeas Corpus by respondent; Decl of Lawrence M Daniels; Ldg Propsd Ord (ir) (Entered: 04/04/2001) |
| 04/04/2001 | 31 | ORDER by Magistrate Judge Ann I. Jones resp hv to 5/4/01 to file retn, ptnr hv to 7/3/01 to file trav (dmjr) (Entered: 04/05/2001) |
| 05/03/2001 | 32 | MOTION by respondent Ernest Roe to dismiss 2nd amd petn for writ of |

| | | H/C (dhl) (Entered: 05/04/2001) |
|---|---|---|
| 05/08/2001 | 33 | MINUTES: opp to mot to dism by 7/3/01, rply nlt 7/17/01, ord req rtn & trav stayed pending resolution of mot by Magistrate Judge Ann I. Jones CR: n/a (dmjr) (Entered: 05/09/2001) |
| 06/18/2001 | 34 | NOTICE OF MOTION AND MOTION by petitioner to extend time (dmjr) (Entered: 06/22/2001) |
| 06/19/2001 | 35 | NOTICE OF DISCREPANCY AND ORDER by Magistrate Judge Ann I. Jones mot for ext of time ord filed & processed & served on resp (cc: all counsel) (dmjr) (Entered: 06/22/2001) |
| 06/20/2001 | 36 | MINUTES: granting motion to extend time [34-1] to file opp to mot to dism by 7/16/01, no further ext by Magistrate Judge Ann I. Jones CR: n/a (dmjr) (Entered: 06/22/2001) |
| 06/27/2001 | 37 | MINUTES: granting motion to extend time [34-1] to file opp to mot to dism nlt 7/16/01, rply nlt 7/30/01, no further ext by Magistrate Judge Ann I. Jones CR: n/a (dmjr) (Entered: 06/29/2001) |
| 06/28/2001 | 38 | NOTICE OF MOTION AND MOTION by petitioner Errol D Smith for second amended petition delayed with diligence to be heard (shb) (Entered: 07/03/2001) |
| 06/29/2001 | 39 | MINUTES (IN CHAMBERS) the Crt construes the motion for second amended petition delayed with diligence to be heard [38-1] as petr's opp to resp mot to dism. The Crt also hereby vacates resp's present 7/30/01 deadline to file his reply to the opposition set forth in the Crt's 6/27/01 MO & ords resp to svc & file his reply NLT 7/16/01. Except as modified herein all provisions of the Crt's 5/8 & 6/27/01 MOs shall remain in effect by Magistrate Judge Ann I. Jones CR: N/A (cc: all cnsl) (rl) (Entered: 07/05/2001) |
| 07/16/2001 | 40 | REPLY by respondent Ernest Roe to opposition to motion to dismiss 2nd amd petn for writ of H/C [32-1] (shb) (Entered: 07/18/2001) |
| 07/16/2001 | 41 | NOTICE by respondent Ernest Roe of appearance that Steven Mercer Deputy Attorney General will have princhpal charge of the case, 300 S Spring St., Los Angeles, CA 90013; (213) 897-2052 (shb) (Entered: 07/18/2001) |
| 07/20/2001 | 42 | REPORT AND RECOMMENDATION issd by Magistrate Judge Ann I. Jones that the crt issue an ord approving & adopting this R&R; & directing that jgm be ent dism the 1st amd ptn w/ prej. (gk) (Entered: 07/24/2001) |
| 07/23/2001 | 43 | NOTICE OF FILING REPORT AND RECOMMENDATION by Magistrate Judge Ann I. Jones and Lodging of Proposed Order (gk) (Entered: 07/24/2001) |
| 07/23/2001 | 45 | NOTICE by petr Errol D. Smith that appellant received transcripts. (gk) (Entered: 08/06/2001) |
| | | |

| 08/01/2001 | 44 | NOTICE OF DOCUMENT DISCREPANCY AND ORDER by Magistrate Judge Ann I. Jones that the petr's ntc that appellant received transc, recd 7/23/01, is to be fld & processed. The filing date is ORD to be the date the document was stamped "received but not filed" w/ the Clerk. (gk) (Entered: 08/06/2001) |
| 09/26/2001 | 46 | NOTICE OF DOCUMENT DISCREPANCY AND ORDER by Magistrate Judge Ann I. Jones that the petr's ntc of appeal, req for cnsl, ord, recd 9/17/01, is not to be fld, but instead rejected, & ORD returned to cnsl. (gk) (Entered: 10/02/2001) |
| 10/23/2001 | 47 | ORDER by Judge A. H. Matz adopting findings, concls, & recommendations of U. S. Magistrate Judge [42-1], [43-1]. ORD that jgm be ent dism this actn w/ prej. (ENT 10/25/01) ntc ptys. (gk) (Entered: 10/25/2001) |
| 10/23/2001 | 48 | JUDGMENT by Judge A. H. Matz: ADJUDGED that the actn is dism w/ prej; terminating case (MD JS-6) . (ENT 10/25/01) ntc ptys. (gk) (Entered: 10/25/2001) |
| 01/08/2002 | 49 | NOTICE OF APPEAL by petitioner Errol D. Smith to 9th C/A from Dist. Court jgm fld 10/23/01, ent 10/25/01 [48-2]. (cc: Errol D. Smith; ST/Atty Gen) COA PENDING (wdc) (Entered: 01/15/2002) |
| 03/06/2002 | 50 | ORDER by Judge A. H. Matz denying certificate of appealability [49-1]. (cbr) (Entered: 03/12/2002) |
| 03/25/2002 | 51 | CLERK'S record on appeal transmitted to Circuit vols: 1. (ghap) (Entered: 03/25/2002) |
| 03/25/2002 | 52 | CERTIFICATE of Record Transmitted to USCA (cc: all parties) (ghap) (Entered: 03/25/2002) |
| 03/29/2002 | 53 | NOTIFICATION by Circuit Court of Appellate Docket Number 02-55503. (wdc) (Entered: 03/29/2002) |
| 06/17/2002 |  | LODGED CC 9th CCA ORDER the req for a certificate of appealability is den. (02-55503) (FWD TO CRD) (weap) (Entered: 06/25/2002) |
| 06/21/2002 | 54 | MINUTES: pth CA ord denying req for certificate of appealability is filed & spread on the minutes of this crt by Magistrate Judge Robert N. Block CR: n/a (dmjr) (Entered: 06/26/2002) |
| 06/21/2002 | 55 | MANDATE from Circuit Court of Appeals denying req for certificate of appealability (dmjr) (Entered: 06/26/2002) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/21/2005 14:29:21 | | |
| PACER | us3877 | Client Code: |

| Login: | | | |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 2:00-cv-10363-AHM-AIJ |
| Billable Pages: | 3 | Cost: | 0.24 |

Exhibit E: Documents, letter, Reporter's Transcript p. 794, and four p. of notes, in regards to sanity/competency claims, total 8 pages.

# EXHIBIT   E

## VALLEY PSYCHIATRIC CENTER
## MEDICAL GROUP, INC.

**Psychiatric and Psychological Services**
General and Forensic / Evaluation and Treatment

3575 CAHUENGA BOULEVARD WEST, SUITE 300
LOS ANGELES, CALIFORNIA 90068
TELEPHONES (213) 876-9133 / FAX (213) 876-4716

January 3, 1996

Jeffrey Treloar, DPD
OFFICE OF THE PUBLIC DEFENDER
300 East Walnut Street, Suite 311
Pasadena, California 91101

RE:     Name      :     **People vs. Errol D. Smith**
        Case No.  :     **GA 023494**

Dear Mr. Treloar:

Pursuant to the Superior Court Order dated 12/5/95 and signed by The
Honorable Judge Stoever, I conducted a psychiatric evaluation of the
defendant herein charged with violation of 187(a) PC said to have occurred
on or about 3/21/95.

I interviewed the defendant at the NCCF Wayside County Jail on 12/20/95.
I reviewed the following:

> Three-volume Preliminary Hearing Transcript dated 6/20/95,
> 6/27/95 and 7/17/95.

> Probation Report dated for hearing 10/18/95.

## PSYCHIATRIC LEGAL ISSUES:

You requested a psychiatric evaluation with specific attention "to see if Mr.
Smith has any past experiences, personality traits or psychological
characteristics that would support or confirm that he actually believed he
was about to be attacked by the gang members..."

## OPINIONS AND RECOMMENDATIONS:

Assuming the validity of the reported history, the defendant would indeed
be an individual more likely rather than less likely to have perceived himself
in danger given the circumstances he described. This was due to a
combination of past experiences as a trauma victim and his having been
without sleep for a few days as the result of cocaine use at and for a

Errol D. Smith   M. Coburn, M.D.    January 3, 1996
Case No.: GA 023494            Page 2

number of days prior to the instant offense.

## DATA AND REASONING BASIC TO OPINIONS:

Mr. Smith is 24, having been born in Los Angeles 7/23/71. He completed high school but "didn't get all the credits" and obtained a GED certificate. He said he has been close with his mother but didn't have a father because his father was killed, hit on a motorcycle, when the defendant was nine or ten. He has three brothers and is the youngest of the four. Two of the other siblings apparently have done well and one is a disabled asthmatic individual who lives with his mother. Mr. Smith denied prior gun use except for target shooting in the mountains. He has had some relationships with women, the longest lasting a year. He has no children.

He possessed the gun used in this offense for two years. He said, "I have been a victim by groups who have trained my thoughts. Every time I come in contact with a group who looks hard, I become uneasy and intense. I've been knocked unconscious — last year —. Two guys hit me from behind and I woke up." He said he was <u>not</u> treated medically but went to a cousin's home and "put ice on it." It was not reported. He said he has became more "timid, scared and disturbed" since that event and "breaks oout in sudden dizziness." He denied any other victimizations but said that there were "other incidents before which had led me to buy a gun."

In the instant matter, he said he was dropping a friend's cousin at a store and waiting for him when "these guys came up to the car and asked me for money and the car. One reached in and opened my back door and I went forward and it knocked him out of the car."

He said he left the parking lot, went around the corner, and the assailant was still <u>on</u> his car. The assailant either dropped or fell off and the defendant then drove around the block to wait for the cousin. He said he saw a group or gang stop another car and that very soon "eight or nine men were fighting the car." He said, "this car is torn up and takes off. I see some guys running up to me with the same stones they were using on the other car. My car (ignition) was off. I couldn't get away. I had a gun."

He could not recall where he had kept the gun in the car that day but said that he pulled it out and very specifically and categorically "didn't want to hit the guys. I fired away from them. I fired up. I ended up hitting one person across the street." He said he was shooting with his head down.

Errol D. Smith       M. Coburn, M.D.       January 3, 1996
Case No.: GA 023494                                         Page 3

He admitted that he had been smoking cocaine and cocaine/marijuana mixed cigarettes, smoking "for a few days with not much sleep." He also had two 16 ounce cans of "Old English" malt liquor on the day of the offense. He allegdly does not know or recall why the cousin was going into the store. His plan had been to go back home for two or three nights.

**Examination** revealed a young man who was alert, oriented, cooperative, tearful at one point when discussing some confusing thoughts and experiences, i.e. "small images" that he sees sometimes, etc. There was no evidence of true hallucinations or delusions, memory impairment, other signs of organic disorder or other symptoms of major mental disorder.

He was very clear on what he perceived and how he was in fact in danger. He did not seem to have considered any possible alternatives to staying around the area because he felt a responsibility to the cousin who he had dropped off in the store. He thought he was out of danger and that the assailants were not going to be again occupied with him. He said he was in intense fear when he was shooting and meant to be shooting upwards so that "the loudness would scare them."

If any corroboration exists for the prior event (including prior times he had spoken of it, information from the cousin for example to whose house he went after it, etc.) it would be quite helpful. I remain available for further questions or comments and welcome your response to this letter.

I have been unable to work full time for the last few weeks due to a back injury and apologize for the delay in preparation of the report. I pray it has not impaired the progress of the case.

Sincerely,

MICHAEL B. COBURN, M.D.
Diplomate in Psychiatry with Added Qualification in Forensic Psychiatry, American Board of Psychiatry and Neurology.
Diplomate, American Board of Forensic Psychiatry.

MBC:mp\ps
sent by fax to Treloar - 3:15 - 1/3.  Revised 1-4-96.

1    TACTICAL METHODS OF MR. SANTWIER. THAT CAN BE DONE ON

2    APPEAL.

3            THE COURT: MR. SMITH, AS I INDICATED TO YOU I HAVE

4    GIVEN YOU SOME LIBERALITY HERE. WE ARE GOING TO HAVE TO

5    FINISH THIS UP.

6            THE DEFENDANT: OKAY, JUST A FEW MORE BRIEF

7    QUESTIONS.

8            THE COURT: THAT IS THREE, RIGHT?

9            THE DEFENDANT: OKAY.

10           Q    IN THE REGARDS TO THE PSYCHE, YOU WERE AWARE

11   THAT A PSYCHE WAS APPOINTED IN THIS CASE?

12           A    YES.

13           Q    AND THERE WERE FULL REPORTS REGARDS IN PSYCHE

14   EVALUATION?

15           A    NO.  NOT THAT I AM AWARE.  I BELIEVE THE

16   PSYCHE SITUATION WAS WHEN YOU WERE REPRESENTING YOURSELF.

17           Q    OKAY, AND YOU HAD A CHANCE TO LOOK ALSO OVER

18   THIS PITCHESS MOTION HERE?

19           A    YES.  SOME OF THE PITCHESS MOTIONS I HAVE

20   SEEN, YES.

21           Q    AND IN REGARDS TO THE PITCHESS MOTION, IS IT

22   TRUE THAT YOU STATED THAT SOME WORK NEEDED TO BE DONE ON

23   THE DECLARATION?

24           A    ON ONE OF THE PITCHESS MOTION IS THAT I

25   BELIEVE WAS RUN IN DEPARTMENT J.  I BELIEVE I SAID THAT TO

26   YOU.

27           Q    OKAY.  I AM GOING TO READ WHAT THE DECLARATION

28   SAYS.

1- information is filed 8/1/95

2- LACoSD Complaint Rpt dated 3/21/95, 4 page
       URN 095-0149-0771-011 by Gutierrez/Currie

3- Major Incident Log, 2 pages, URN 095-01499-0771-0[ ]
       dated 3/21/95

4- LASD Supplementary Rpt, dated 3/21/95 file # 095-01499-07[ ]
       011, 1 page, by YALOWIEC, L /ESTRADA

5-    ✓            ,            ,            ✓
          2 pages, by Det. PLOCH

6-    ✓                      ✓            ✓
          3 pages, by WILLARD

7-       ✓                               ✓
          7 pages, by Gutierrez / Currie

8-    ✓                      ✓            ✓
          3 pages, by S. Sul[ ]

9- LASD Supplemental Rpt, 3/21/95, 095-01499-0771½-011
       2 pages typed, by Det Drake

10- LASD Supplementary Rpt 3/21/95 file # 095-01499-0771-0[ ]
       4 pages, typed by G. Pittes 3/21/95
       + 2 pages, typed surveillance by Errol Smith

11- LASD Supplementary Rpt, 3/21/95 file # 095-01499-0771-0[ ]
       [ ] pages, by Currie / Gutierrez

12-    ✓                      ✓            ✓
          3 pages   by BADN Rousseau

13- CHP Vehicle Rpt, 3/21/95, file 095-01499-0771-011

14 - CHP vehicle rpt 3/22/95, file # 195-01499-0772-735
095-01499-0771-017
5 pages by TIBBETT, (THORSTEN STEIN)

15 - Booking sheet of Smith, Errol, 3/22/95, 2 pages

16 - TT, 3/22/95 2:39:10, 4-½ pages fr. CV to CL

17 - TT, 3/22/95 2:42, 4-½ pages ✓

18 - TT, 3/22/95 2:43, 5-½ pages ✓

19 - TT, 3/22/95 2:44, 3-½ ✓ ✓

20 - TT, 3/22/95 2:44:36, 2-½ ✓ ✓

21 - ✓ ✓ 2:45:13, 2-½ ✓ ✓

22 - 2:48:12, 6-½ ✓ ✓

23 - LASD - Supplementary Rpt, 3/22/95, file # 095-01499-0771-0
1 page, by DINO

24 - ✓ ✓ ✓
2 pages, by GIBBONS

25 - Transcript of Statement by Errol Smith &
interv. by Gentzwein + Kushner 3/22/95, 19 pg

26 - LASD Supplemental Rpt, 3/24/95, 095-01499-0771-01
3 pages, typed by Gentzwein / Kushner

27 - LASD Scientific Serv Bureau, 3/28/95
receipt H 693464, 1 page, by D. Higashida

28 - ✓ ✓ 3/30/95 lab rpt
receipt H 648999 (GSR), 1 page, by D. Anderson

29 - LASD - Supplem'tal Rpt, ___/ ___/ ___, file # 095-01499-0771-0
13 pages typed by Det Kushner / Gentzwein

30 - Autopsy on Richards Jastin, 95-0222b, 19 pgs

31 - Order app authority Dr. Coleman, 7/11/95

32 - Order appointing Patrick Bell dated 3/7/96
3 pages
33 - Order for Expert Access to Evidence, filed 3/12/96, 2 pages
34 - Prelim Trans., 6/20/95, 152 pages
35 - ✓ , 6/27/95, 12 pages
36 - ✓ , 7/17/95, 45 pages
37 - Typed memorandum by Judge Augusto
on application of Toledo Doctrine @ Prop ~~B~~ 115
prelim hrg, 15 pages, dated 8/3/95
38 - probation rpt, dated 10/18/95, a/c no 640234
on Errol Smith, 15 pages
39 - Notice of Motion for Pre-Trial Discovery, filed 11/21/95
for 12/5/95, consisting of 9 pages
40 - Motion to Set Aside Information (§995)
filed 11/3/95, hrg on 11/7/95, 10 pages
41 - People's Opposition to Defendant's §995 Motion
filed 12/20/95 for 12/21/95, 6 pages
42 - 2 page letter from DA Mac to Det. Gentzyuen
dated 7/1/96, plus 2 page wit. list
showing 64 potential wits.
43 - package of handwritten notes by Inv.
Kushner consisting of 10 ~~pgs~~ pages
44 - package of handwritten notes by Inv. Gentzyuen
consisting of 16 pages
45 - Rap sheets on Pernelle Daniels, Yasmin Brown
Lori Scorpio, Brenda Minnifield, Deborah Anderson
Daniel Carter, Fred Hines, Robert Bilder, Joseph Lett

Yoorkaa Gardner, and Lorenzo Belser
dated 7/23/96

46 - LASD Murder Book, file no. 095-01499-0771-011
consisting of 114 pages, plus title
page & 3 page table of contents

47 - tape of statement of Errol Smith case # 095-01499-0771.

48 - color photos of Yoorka Gardener (x2), Joseph
Lett (x2), Robert Belser, Termel Mercer,
Lorenzo Belser, and Errol Smith

49 - LASD Supplementary Rpt dated 3/21/95, file no.
095-01499-0771-011, 2 pages, typed, by
Det. Miller

50 - LASD Supplemental Rpt, dated 3/16/95, file no.
595-01030-0751-067, 2 pages, typed, by
Det. Drake

51 - LASD Supplementary Rpt dated 4/7/95, file no.
095-01499-0771-011, 7 pages, typed by
Sgt Kushner / Inv. Sentzwein

52 - LASD Supplementary Rpt, dated 3/21/95, file no.
095-01499-0771-011, 2 pages, typed
by Arthur-Parra, Crime Scene Inv.

53 - tel-type dated 3/21/95, 5-1/2 pages of
Errol David Smith